## SINGER MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.
### No. 7509.

Circuit Court of Appeals, Seventh Circuit.

March 21, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1119, 85 L.Ed. ——.

Arthur E. Pettit, of New York City, and Roland Obenchain, of South Bend, Ind., for petitioner.

Robert B. Watts, General Counsel, N. L. R. B., of Washington, D. C., for respondent.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner seeks to have set aside and respondent to enforce an order entered by the National Labor Relations Board June 6, 1940, determining that petitioner has refused to bargain in good faith with its employees and their regularly designated collective bargaining agent and directing it to cease and desist from such refusal and from "in any other manner interfering with, restraining or coercing" the employees in the exercise of their rights guaranteed by Section 7 of the Act. U.S.C.A., Title 29, Sec. 151 et seq. The Board ordered affirmatively that petitioner, upon request, bargain collectively with the bargaining agent, herein designated the United, and post notices of intention to comply. Petitioner insists that the record contains no evidence substantiating the finding that petitioner refused to bargain and that, under the proof, the order is directed toward compelling petitioner to maintain a state of mind rather than to perform specific acts, is too broad and, under the proof, wholly improper. No question is presented as to jurisdiction or as to the fact that the United was the duly designated bargaining agent.

At the outset, in considering whether there was substantial evidence to support a finding that petitioner has refused to bargain collectively, we are faced with a collateral question dependent largely upon the subsidiary inquiry (1) whether the order in effect seeks to compel petitioner and its officials to formulate in their minds specified mental concepts, and (2) how far, as a matter of law, the Board may go in determining whether an employer has bargained "in good faith."

For more than a year petitioner and United had negotiated with reference to a written contract. Some twelve meetings, submission and resubmission of proposed drafts, suggestions and countersuggestions in regard thereto ended without tangible fruitful result. This evidence, petitioner asserts, can support a finding only that petitioner has negotiated within the meaning of the Act. The Board, on the contrary, found this dealing to be a sham, a pretense, carried on with actual intent upon the part of petitioner not to bargain and not to arrive at any agreement.

The Board's conclusion of fact in this respect was that petitioner's "* * * plan and purpose, reflected by its conduct during the negotiations, is clear. It would meet and deal with the United whenever requested, it would appear to listen with respectful attention to the United's demands, and it would pretend a semblance of an endeavor to reach a mutual understanding. However, it would refuse to agree with the United to grant conditions of employment or make concessions which it was willing to grant the employees directly, and would require the United to accept less desirable conditions of employment than it would grant the employees if they bargained individually, or than they were legally entitled to receive in the absence of a collective agreement. Thus the petitioner's hostility to the United would be manifested, membership in the United discouraged and, by pretending to bargain, collective bargaining defeated." The natural effect of such course of conduct, the Board found, was to imply to employees that their best interests lay in their continued reliance upon the generosity and good will of their employer; that the United could not secure for them any substantial objective sought by them with respect to terms and conditions of employment, but that, on the contrary, the employees' continued membership in the United constituted a threat of loss of desirable conditions and terms already enjoyed and that petitioner entertained no desire to reach an agreement with the United and made no effort in good faith so to do. Concerning the statutory burden of petitioner, the Board said "The duty encompasses an obligation to enter into discussion and negotiation with an open and fair mind and with a sincere purpose to find a basis of agreement concerning the issues presented, and to make contractually binding the understanding upon terms that are reached."

Petitioner asserts that upon this reasoning men may, by legislative fiat and administrative order, be compelled to be "fair, just, honorable, generous, kind and humane," that if the Board may enter this order, it may equally as reasonably direct abolishment of "selfishness, greed, cruelty and hostility." It invokes the premise that laws are made to govern action, not to control beliefs and opinions. With this hypothesis we have no quarrel. And we think its reasoning wholly compatible with the present situation. We realize full well that Congress has provided only that certain acts shall be performed or omitted. The statute requires of the employer that he bargain collectively and whether he does so depends upon the character of his acts

## 134

of commission or omission. Collective bargaining is an act; pretended collective bargaining is an omission to perform the act, and no unusual difficulty arises because, in determining whether bargaining within the meaning of the Act has indeed occurred, the trier of the facts must determine whether the acts proved were rendered in good faith or were merely in pretended good faith and performed with the actual intent to achieve the very opposite of collective bargaining. Existence or nonexistence of good faith, just as existence and nonexistence of intent, involve only inquiry as to fact. Whether a crime has been committed not infrequently depends upon existence or nonexistence of a felonious intent. Whether one is a bona fide purchaser for value of negotiable paper before maturity without notice puts in issue questions of fact. The neutrality required of an employer in his transactions with his employees is another intangible product of fact, the existence or nonexistence of which usually depends upon the character of acts committed or omitted. The civil law furnishes repeated instances of application of the principle.

■■ By the Labor Act, Congress, with expressed intent to prevent industrial strife and to promote industrial peace, has conceived and enacted remedial legislation. It has placed upon the employer the duty, in the interest of public welfare, to enter into discussion with its employees with open and fair minds, with sincere purpose to find basis for agreement. No employer, party to a labor controversy, may rightfully refuse to comply and thus work a detriment to the public interest, peace and welfare. In Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 597, 81 L.Ed. 789, the court reviewed a decree requiring the railroad company to "treat with" the agent of its employees and to "exert every reasonable effort to make and maintain agreements." The company insisted that its obligation to bargain was not a fit subject of a decree in equity because negotiation depends upon desires and mental attitudes, far beyond judicial control. It argued that, since equity cannot compel parties to make an agreement, it will not compel them to take the preliminary steps which may result in agreement. But the court rather curtly disposed of this contention, saying: "Whether an obligation has been discharged, and whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts

in framing and enforcing their decrees." The greatest of rascals may solemnly affirm his honesty of purpose; that does not foreclose a jury from finding from the evidence submitted that he possesses no trace of such innocent quality. We think the Board had full authority to determine as a fact whether petitioner was acting in good faith or whether its actions amounted to a mere superficial pretense at bargaining,—whether it had actually the intent to bargain, sincerely and earnestly,—whether the negotiations were captious and accompanied by an active purpose and intent to defeat or obstruct real bargaining. N. L. R. B. v. Whittier Mills Co., 5 Cir., 111 F.2d 474; Agwilines, Inc. v. N. L. R. B., 5 Cir., 87 F.2d 146; N. L. R. B. v. Express Publishing Co., 5 Cir., 111 F.2d 588; Globe Cotton Mills v. N. L. R. B., 5 Cir., 103 F.2d 91; N. L. R. B. v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713; N. L. R. B. v. Link-Belt Co., 61 S.Ct. 358, 85 L.Ed. ——; New Idea, Inc. v. N. L. R. B., 7 Cir., 117 F.2d 517; Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.

■■ Petitioner insists in this connection that the order is vague and indefinite. We do not think the criticism well founded. If substantial evidence supports the finding of no bona fide attempt to bargain, the Board may not dictate the terms of the formal contract; but it may direct petitioner to do that which the Act requires,— to bargain in good faith. In this we think there is no vagueness. We have no doubt that if petitioner so acts as to indicate its bona fides, it will experience no difficulty. It cannot be forced to enter into an agreement but it can be compelled to conduct negotiations in an honest attempt to arrive at an agreement in conformity with the spirit and intent of the Act. The negotiations may fail, but petitioner will experience no hardship in so acting as to convince the Board or the court of its honesty of purpose.

Obviously all we have said concerning the order is dependent upon the ultimate question of whether there was substantial evidence to support the Board's finding of failure to bargain collectively in good faith. Consequently it has been necessary to examine the record.

In December, 1936, certain of petitioner's employees were chartered as a local of the United Automobile Workers of America. This group almost immediately took steps

looking toward collective bargaining. On July 20, 1937 the union transferred its membership to the United Electrical, Radio & Machine Workers of America. At the request of United, conferences were had between its committee and petitioner in February, March, April and October, 1937, February, March and April, 1938, none of which resulted in a contract. On May 14, 1938, the Board issued a complaint charging that petitioner had refused to bargain. At the conclusion of the hearing thereon, the examiner allowed the motion of petitioner that the complaint be dismissed on the merits, counsel at that time stating that the management had been and would in the future be willing to bargain with United. In the present proceeding, arising under a subsequent complaint, it was stipulated that the Board might receive the record of the original proceeding in evidence, provided, however, that the admission should not have the effect of raising any issue with respect to any act of petitioner occurring before May 25, 1938 and that the dismissal of the prior proceeding should remain res adjudicata respecting such acts. The Board, in arriving at its conclusion here involved, declared that evidence of events occurring prior to conclusion of the earlier proceeding had been considered only in determining the propriety of petitioner's conduct since that time and not as basis for any finding of unfair practices. In other words, the Board confined its findings and conclusions to the conduct of petitioner subsequent to the termination of the first proceeding, except that it adverted collaterally to the earlier events in order to determine whether they threw any light upon the character of petitioner's conduct since that time.

After dismissal of the original proceeding, petitioner and the United resumed negotiations in June, 1938, and thereafter twelve conferences were had (the last, subsequent to the filing of the present charge), wherein various proposed drafts of contracts were submitted, discussed and criticized. Petitioner submitted from time to time counterproposals. On April 11, 1939, United called a strike, relying, as immediate justification, upon the fact that petitioner had hired a new employee in preference to others previously laid off, who the United claimed deserved priority. This employee shortly thereafter resigned, however, and the strike persisted apparently because of the claim of United that petitioner had not bargained in good faith. Apparently, at the close of the conference on April 18, 1939, the parties were no nearer an agreement than at the beginning.

The complaint here involved was issued April 17, 1939 and hearing upon the charge of failure to bargain in good faith began on May 4, 1939. The evidence considered by the examiner included documents representing the recollections of petitioner's representative as to what occurred at the conferences, various drafts of contracts submitted by United, letters exchanged between petitioner and United and oral testimony of representatives of United. The examiner's findings and recommendations are not included in the transcript. The Board considered the evidence in its relationship to (1) paid holidays, vacations and bonuses; (2) wages; (3) hours of employment; (4) duration of contract; (5) discrimination, strike and lockouts, and (6) seniority. In so far as these subject matters were discussed in the various conferences, the evidence is not greatly in dispute. The disagreement of the parties arises out of the inferences drawn by the Board.

The dates of the conferences were June 16, 17 and 23; July 8, September 1, October 28, November 4 and 17, and December 16, 19, 1938; January 20, 1939; April 14, 1939, April 17 and 18, 1939. At the meetings prior to January 20, 1939, United presented proposed contracts, six in number. Two of them included some twenty articles dealing with an even greater number of matters. Petitioner made countersuggestions; no agreement was reached. On March 22, 1939 the United wrote petitioner that it had voted "not to participate in any further negotiations unless there is a chance of settlement" and postponed "indefinitely" petitioner's offer of further conferences. Under date of March 27, 1939 petitioner expressed the hope that United might see fit to renew negotiations in the near future. At a conference held on April 14, 1939 there were present representatives of United and of petitioner and federal and state conciliators. United then requested resumption of collective bargaining and April 17, 1939 was agreed upon. On that date and on the 18th further conferences were had. United then declared that its committee would consider all of petitioner's proposals and would prepare and submit to petitioner a new contract which would incorporate United's views upon the subject of recognition, seniority, grievances, wages and hours, and requested that petitioner call the committee when it was

136

possible to resume bargaining. Petitioner then stated that it was willing to consider such redraft as soon as the committee could deliver it; that it had received notice of hearing before the Board on May 4, 1939 and that because of this it might not be possible to renew negotiation until after the hearing. On April 19, 1939 United presented a draft containing seven articles. On April 28, petitioner replied thereto accepting the preamble, suggesting a substitute for Article I regarding recognition, making a counterproposal as to seniority of the character it had previously insisted upon, offering a counterproposal in lieu of Article III as to hours in accord with what it had previously urged, suggesting that it saw no reason to change its position with regard to minimum rates, tendering a substitute article reducing wages ten per cent and other articles in lieu of Article V and Article VI as to grievances, strikes and lockouts and, finally, as to Article VII, urging that the contract should be indefinite in duration and continue until terminated. However, it said, this last question need not be a stumbling block. In none of the particulars mentioned did petitioner recede from its position in the conferences begun in early 1937 and continuing over a period of two years, except that it said that the duration clause need not constitute a stumbling block. Petitioner's expressed attitude upon each of the controverted questions remained the same for the entire period. The record fails to disclose any attempt upon its part so to modify its demands as to meet any of the proposals of the union upon any of the matters discussed.

■ Proceeding to the specific subject matters involved, we find a controversy first as to paid holidays, vacations and bonuses. After considerable negotiation, United proposed that the then existing policy of the company with regard to paid vacations, legal holidays and bonuses be preserved in the contract, subject to collective bargaining thereafter. Petitioner claimed it had pursued a certain practice in this respect since 1936 and that it expected to continue the same, subject, however, to its discretion. It insisted that these items involved voluntary gratuities, the allowance or disallowance of which was to be determined by petitioner alone. It did not refuse to place in the proposed agreement a provision regarding this subject matter, and admitted that paid holidays and vacations and bonuses were proper elements to be considered in bargaining. But it insisted that

the contract should provide that it might change its practice whenever "in its opinion such action seemed necessary" and refused a proposal that the agreement should provide for continuation of existing practice and modification thereof by either collective bargaining or arbitration. This position it maintained throughout the entire period of negotiation. The Board did not believe that this attitude was in good faith or in accord with the intent of the Act, for the reason that the number of paid holidays, the duration of vacations and bonuses were, within the contemplation of the legislation, matters obviously affecting the terms and conditions of employment and, therefore, proper subject matter for discussion and settlement by collective bargaining and that no employer dealing in good faith with its employees upon a proposed contract of employment could legitimately persistently refuse to enter into negotiations concerning such vital terms and conditions of employment. The Board believed the circumstances such as to justify a conclusion that petitioner was unwilling to contract with the United to do that which it had been in the habit of doing before United came into the shop. The Board's position is that an employer who insists upon reserving the right to act unilaterally and of its own will alone upon matters involving legitimate collective bargaining and denies the employees any contractual provision for opportunity to bargain collectively with regard thereto thereby refuses to bargain collectively within the meaning of the Act. With this reasoning we agree. Petitioner's default in this respect did not lie in its refusal to cover the subject matter by contract but in its refusal to preserve the right of collective bargaining with reference thereto.

■ The Board believed that the negotiations as to wages evinced a design upon petitioner's part to impress upon its employees a comparative disadvantage of collective dealing. Shortly after the organization of United, petitioner's plant manager called the union president and told him that the petitioner had learned that United had been recognized and asked what the grievance was. On January 3, following, petitioner voluntarily announced a general wage increase of five per cent. In April, after negotiations had been begun, petitioner rejected United's request for a wage increase but within a month voluntarily granted a further ten per cent increase without reference to United or its position. However, in all conferences after disposal

of the first proceedings, petitioner insisted that if there was not a ten per cent cut there could be no agreement. It suggested that it had not reduced wages since 1920; that between 1920 and 1929, rates had been raised and continued to be raised, with no reductions during the depression of 1935, with paid holidays in 1935 and bonuses in 1936; that it had granted two wage increases in 1937; that its officials' salaries had been reduced; that the industry generally had cut wages in contrast to petitioner's failure to do so; that the plant was engaged in the manufacture of cabinets which could be bought from furniture manufacturers; that it was in competition with the furniture industry, which had an average rate of 53.4 cents whereas petitioner was paying 77.1 per hour; that its business was in such condition that a cut was necessary and that wages must be restored to those in effect on May 29, 1937. From its position in this respect, petitioner at no time receded. United rejected the proposal when it was first submitted in April, 1938, and voted to authorize a strike if petitioner reduced wages as it said it was compelled to do. The works manager said he would not accept a contract which interfered with the company's sole control of wages; that petitioner would decline to consult with United in the matter of reduction. Petitioner refused to refrain from further reductions during the life of the contract, except that it offered to agree to post a notice two weeks in advance of effective date of any reduction, so that, if United cared to, it might discuss the matter with the manager. We do not find any evidence that petitioner offered to agree to no further wage alteration. Rather the evidence is that its final proposal was that wages should be reduced ten per cent. Petitioner proposed that the contract should be so drawn that if petitioner and United could not agree, the United might propose arbitration which the company would be privileged to refuse, in which event both parties "would be free to act as they choose in the matter."

The Board found inconsistency in petitioner's attitude in that it demanded an immediate cut, saying that it was "imperative" and must be an integral part of any agreement, even though terminable on 30 days' notice, but later declaring that the effective date of reduction could be fixed later. Thus, said the Board, petitioner clearly indicated that the reduction was not imperative and that demanding it was intended to convince the men that United could not obtain a proper collective agreement.

Petitioner could not be compelled to enter into a contract which did not reduce wages or which bound it not to make a reduction in the future. It had the right to insist that the question of wages be settled and such settlement was proper subject matter for collective bargaining. But the employees had the right also to include in the contract a clause recognizing the right to bargain collectively as to wages. Whether the parties agreed upon wages or came to an impassé, the employer could not, under this Act, refuse to have included in the contract a proper bargaining clause with reference to wages. This is subject matter no longer to be determined unilaterally by the employer. The Board itself suggested that it might not find sufficient evidence of a refusal to bargain in this respect alone but that it believed the circumstances such that, taken in connection with other evidence, they indicated upon the part of petitioner a determination not to bargain collectively as to wages and a further intent to refuse to include in any contract a proper bargaining clause as to wages.

As to hours of employment, on June 16, 1938, the United proposed an 8-hour day, 40-hour week, which was then the regular schedule, and in addition time and a half for over-time. Petitioner at first insisted that over-time payment commence after a 9-hour day and a 49-hour week. When the Fair Labor Standards Law, 29 U. S.C.A. § 201 et seq., was enacted, petitioner proposed that the contract provide that no employee should work more than 1000 hours during any consecutive 26-week period. That Act established a standard of payment of time and a half for more than 44 hours per week, in the absence of existing agreement otherwise. The suggestion of petitioner clearly would have removed its existing standard and excused it from the normal obligation of the over-time payment provision of the Fair Labor Standards Act. It proposed to create a standard which had previously not been in existence at petitioner's plant, much more favorable to it, for under its proposal these employees might be required to work 12 hours per day and 56 hours per week without payment for any over-time. United declined, but offered to accept as an alternative, a 9-hour day and 40-hour week, before over-time payment, or an 8-hour day and 44-hour week before over-time payment, as provided by

the Fair Labor Standards Act, or reference of the matter to arbitration. Petitioner declared that it was willing to indicate that the company's policy of an 8-hour day, 40-hour week, "would, so far as convenient, continue." But it resisted all proposals to include a bargaining provision, on the ground of business necessities and a desire to be free to meet emergencies as it might deem necessary. But the record discloses no evidence of such necessities or emergencies. And again we find petitioner insisting upon express reservation of the right to determine terms of employment, limited in no way by provision for collective bargaining with reference thereto. It is difficult to conclude other than that the company's attitude in this respect was an attempted evasion of the Fair Labor Standards Act and of the spirit and intent of the Labor Act. It was a question for the triers of the facts to determine whether petitioner's acts and declarations upon this subject matter were in good faith or rather inspired by a desire to evade and escape the provisions of the Act.

The parties arrived no where upon the question of duration of the proposed agreement. United suggested that the contract run for one year and continue from year to year unless cancelled for cause by either party upon 30 days notice. Petitioner insisted upon an unrestricted right to cancel on 30 days notice. United replied that the contract might be drawn subject to such termination but that it should continue for one year if not cancelled. Petitioner objected to this, saying that it was opposed to contracts for definite terms. United then reverted to its original suggestion, which met with rejection by petitioner. United offered to accept a qualification that if either party should desire to modify the annual contract, conference looking to this end might be called and if as a result the parties should fail to agree, the matter could then be arbitrated. This, too, was rejected by petitioner who said, however, that it was not averse to a limitation of 60 or 90 days. After the proceeding was instituted petitioner announced that it would be willing to agree upon some "reasonable initial period," subject to the 30-day clause. The Board found inconsistency again in petitioner's acts in that, though it rejected the one-year contract and insisted upon a 30-day cancellation right, nevertheless it also declared that it desired a contract of indefinite duration in order to obviate

necessity of periodic negotiations, saying that "a contract ought to continue for a long period of time and not automatically terminate." The Board approved United's reply that for all practical purposes petitioner's suggestion would result in an indefinite contract for no longer than 30 days, if petitioner so willed; that any agreement ought to run for a definite time and that petitioner, contrary to its declared proposal, was really, by its suggestion, paving the way for frequently recurrent negotiations and consequent instability. We confess that reading of the record brings to us an inference of captiousness and inconsistency, upon the part of petitioner in this respect.

Concerning discrimination, strikes and lock-outs, United on June 16, 1938 submitted a clause by the terms of which petitioner promised not to discriminate against employees because of union activity. Petitioner insisted that this was unnecessary. To United's insistence upon a clause binding the United to refrain from unfair tactics on any fellow employee and union solicitation on company time, petitioner agreed "in principle" but objected to any similar clause as to discrimination by itself upon the ground that such was its legal duty irrespective of contract. When United abandoned its request for a non-discrimination pledge by petitioner the latter persisted that United obligate its members as it had suggested.

United proposed that there be no strike by employees or lock-outs by employer until all peaceable means of resolving difficulties should be exhausted. Petitioner again replied that a provision against lock-outs was not necessary, as they were prohibited by law, but insisted upon a broad prohibition against what it considered wrongful strike activity by United, a violation of any of the terms of which would constitute basis for discharge of the employee. Once more United proposed to delete the provision forbidding lock-outs and to reduce the extent of restraint upon the right to strike as petitioner had urged. But these counterproposals were rejected. Obviously petitioner was not bound to accept any particular provision. The only question is as to whether its resistance was bona fide. The Board believed that the petitioner's expressed reason for rejecting the lock-out provision was specious and that petitioner disclosed its lack of good faith when it said that lock-outs were prohibited and that the clause was therefore, unnecessary.

The company manager refused to be bound not to shut down if the plant was picketed by non-employees. The Board believed that petitioner unreasonably attempted to forestall use of economic weapons permissible in seeking amicable settlements through collective bargaining, and concluded that petitioner "denied to the designated representative of the employee that equality of status which the Act expressly sets forth as * * * an essential basis for collective bargaining" and "in effect, insisted that United accept an inferior position by accepting a contract which imposed restrictions only upon United, and in the most sweeping terms."

The parties did not agree upon the terms of the seniority clause. Petitioner insisted that it should have the right to lay off or rehire on the basis of an employee's (1) ability and fitness to perform service; (2) special training and (3) family status; that seniority should not be involved unless the employee should have been in petitioner's employment for twelve months; that any employee should cease to be entitled to consideration for length of service if he should quit voluntarily or be discharged for cause or absent without permission or fail to return to work when called or if a period of three months had elapsed after he was last on the payroll. The discussion between the parties on this subject matter had to do chiefly with whether the element of family status should be included in determining seniority. Each party seems to have been equally tenacious, but United finally advised petitioner that it would accept the proposal on seniority if it could be shown that such is "the present policy practiced in the plant." Petitioner rested upon its mere allegation that its suggestions conformed to its present practice. Facts proving such practice were clearly within its power to produce; its failure to do so does not carry an implication of good faith.

From these circumstances and others so voluminous that they have no place in this already too greatly extended opinion, the Board concluded that petitioner had not attempted to bargain in good faith. It considered petitioner an employer who in its mind did not give free assent to the Act or to attainment of the rights secured to employees thereby or to the intent of the Act to promote industrial peace but who desired and hoped to defeat the legislative purpose.

 As we have pointed out, there is a duty to enter into discussion with an open mind. An employer must keep ever before him the remedial purpose and intent of the Act; he must not seal his mind against the thought of entering into an agreement but rather make a sincere and earnest effort to bargain collectively with the representative of his employees. N. L. R. B. v. The Boss Mfg. Co., 7 Cir., 118 F. 2d 187, decided March 17, 1941. The circumstances appearing in the two years' negotiations, fruitless as they were, all bore upon the question of good faith of the employer. The record may disclose instances of inconsistency upon the part of United's committee, but the ultimate question was whether petitioner had bargained in good faith with its employees within the meaning of the Labor Act. This was essentially a question for those who pass upon the facts. Had this cause been tried in court, a question would have been presented which the judge might not rightfully have taken from the jury. We cannot say as a matter of law that the Board, the trier of the facts, was not justified in giving weight as it did to the circumstances we have recited and others appearing in the record as proof of failure of petitioner to make a genuine effort to arrive at an executed contract with its employees. The evidence is such as to prevent us from substituting, even if we preferred, a contrary conclusion for that of the Board.

 Petitioner, complaining that that portion of the order which directs petitioner to cease and desist from interfering with, restraining or coercing its employees in the exercise of their rights guaranteed by Section 7 of the Act "in any other manner" is beyond the Board's power, relies upon the language of this court in N. L. R. B. v. Swift & Co., 7 Cir., 108 F.2d 988, 990, wherein we said that the Board was not warranted in enjoining respondents in that cause from committing any act "which might constitute a violation of Sec. 7 of the Act."

 In the interest of certainty administrative orders and judicial judgments should be limited strictly to disposition of only such issues as are actually presented. The language of Mr. Justice Stone, in N. L. R. B. v. Express Publishing Company, 61 S.Ct. 693, 700, 85 L.Ed. ——, decided March 3, 1941, as follows, is applicable: "The National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely be-

cause the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past. That justification is lacking here. To require it is no more onerous or embarrassing to the Board than to a court. * * * An appropriate order in the circumstances of the present case would go no further than to restrain respondent from any refusal to bargain and from any other acts in any manner interfering with the Guild's efforts to negotiate."

So here the order appropriately should go no further than restrain petitioner from refusing to bargain and from any other acts in any manner interfering with United's efforts to negotiate. The order will be modified as indicated and, as modified, enforced.