## NATIONAL LABOR RELATIONS BOARD v. BERKLEY MACHINE WORKS & FOUNDRY CO., Inc.

No. 5517.

United States Court of Appeals Fourth Circuit.

Argued April 2, 1951.

Decided June 2, 1951.

Soper, Circuit Judge, dissented in part.

Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, and William J. Avrutis, Attorney, National Labor Relations Board, all of Washington, D. C., on brief), for petitioner.

William L. Parker, Norfolk, Va., for respondents.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

·PARKER, Chief Judge.

This is a proceeding instituted by the National Labor Relations Board to attach the Berkley Machine Works & Foundry Company, Inc., of Norfolk, Virginia, and two of its officers for contempt of. court in failing to bargain collectively in good faith with a labor union as directed by decree of this court entered on July 20, 1946. A special master was appointed to hear the evidence bearing on the alleged contempt and report same with his findings of fact and conclusions of law. He has heard the parties at length and has submitted a comprehensive report exonerating the respondents of the contempt charged. We have carefully examined the evidence; and while we accept the findings of the special master to the effect that respondents were not guilty of bad faith in the sense of willful disobedience of the court's order in their negotiations with the union, we think it clear upon the record that the respondents have failed to bargain collectively with the union as contemplated by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq. and as the court had directed in its decree.

The evidence discloses that the president of the respondent company was strongly opposed to the unionization of the plant and refused to recognize the union as representing the employees until it had been certified by the Labor Board. Following this certification, the bargaining was of so unsatisfactory a character that an unfair labor practice proceeding was instituted before the Board in 1945 and an order was entered directing the company to bargain with the union and this was followed on July 20, 1946 by the consent decree of this court enforcing the order. Prior to the consent decree the union had made sundry written proposals of a bargaining agreement to the company, but the latter had made no written proposal of any sort. On July 9, 1946 the union had presented a written proposal of a collective agreement in which it abandoned its request for a closed shop and certain other matters and provided for continuing the existing wage and hour conditions for a period of twelve months, with provision that wage rates might be revised by collective bargaining upon thirty days' notice given by either party; but no serious consideration appears to have been given to this proposal.

After the decree of this court, the company in August 1946 presented its first proposal of a collective agreement; but this did little more than propose a procedure for settling grievances. With respect to hours of work, it provided a forty hour week, Monday through Friday, "for the present" without limitation upon the right to change this at any time for any ·reason or for no reason. With respect to wage rates its only provision was: "Any rates now ·being paid can be changed at any time by the Management of the Company, either in the ·way of an increase or decrease, depending entirely upon the qualifications and merits of the individual concerned." It is not without significance that this proposed agreement, which followed generally the language of the paragraph of the union's proposed agreement as to purpose, omitted the words "and to set forth a basic understanding relative to rates of pay, hours of work and conditions of employment" contained in the proposed agreement submitted by the union. Such language obviously would have had no appropriate place in the agreement offered by the company, which dealt with none of these matters in any substantial way.

In November 1946 the union submitted another proposed agreement in which it endeavored to meet the views of the company as to a number of matters and which preserved the status quo as to wages and hours.

of work subject to the rights of the parties to discuss and negotiate pay changes upon 30 days' notice. A discussion was had with regard to this in May of 1947 but resulted in no agreement. In November 1948 the union submitted another proposed agreement to the company, in which it was again proposed to continue the status quo with a provision for the continuance of wage rates which were actually in effect at the time; but this, likewise, resulted in no agreement. In January 1949 the union requested the company to submit a counter-proposal; but the company did not submit one. Not until the company had been cited by this court to show cause why it should not be attached for contempt and three days before the hearing before the special master was to begin did it file such counter-proposal. In this proposal, it refused to bind itself as to wages for any appreciable period and refused to agree even on the status quo for a period of more than three days, the paragraph relating thereto being as follows:

"Section 6. The present belief of the company is that economic conditions will not require it to reduce the minimum straight time hourly wage rate in effect for employees within the bargaining unit for a term of one (1) year from the date of this agreement, and it agrees that if in the future and during such one-year term economic conditions shall require a reduction in the straight time hourly wage rate in the opinion of the management of the company, then the company will notify the union of its determination and request a conference for the purpose of discussing a reduction in the straight time hourly wage rate; and upon receipt of such notification the union agrees to accord a conference within three (3) work days after the notice from the company, and the company agrees not to make any such reduction effective until conference has been held or three (3) days have elapsed from receipt of notification of the union, whichever time shall first arise.

"The company shall have the right to pay individual employees at a higher hourly rate based upon performance in accordance with its determination of ability and performance."

The fact which stands out in the case is that, while there has been no disagreement between the parties as to wages or hours of work, no strike and no controversy as to working conditions, the company has refused to execute any written agreement with the union, notwithstanding repeated efforts on the part of the union to reach an agreement on the basis of the status quo and with surrender of a number of the points upon which it had been insisting. We think it perfectly clear from the record that this refusal was based upon the unwillingness of the company to bargain with the union as to wage rates. It was willing to give assurances that it would pay the prevailing rate in the area; but it was unwilling to bind itself to pay any specific rate for any specified length of time and was unwilling to bargain at all with respect to merit pay but insisted on its right without consulting the union to vary the rates of pay for individual employees. With respect to its refusal to commit itself to any definite wage rate for any period of time, its attitude is set forth in the following testimony of its attorney, Mr. Ashburn:

"Q. So that the extent of the company's statement regarding a commitment, if I understand you correctly, was a statement by the company that it did not contemplate a departure, and it argued to the union that it should take into consideration the fact that it would be impractical for it to depart from its current pay scales because it would lose men to other employment if it did so. Is that what the company's statement was in effect to the union? A. Yes. I go back to what we have already said. There was not any great argument or divergence of views concerning the minimum pay scale. The argument never centered around that.

"Q. It is in effect that statement to which you refer when you testify, and when you have testified, with regard to the company having represented to the union representatives that it was willing to bind itself with respect to a minimum pay rate for the life of a contract? A. Yes, sir.

"Q. So, in effect, what the company states was its intention, and the logic of

its not changing from its intention, isn't that so? A. Yes.

"Q. That was what the company stated? A. Yes."

The special master thus appraised the issue which prevented the parties from arriving at an agreement: "The issue in dispute was the right of the Company without consulting the Union (1) to lower its general and existing scale of pay if economic conditions produced a reduction in the prevailing wage in the area, and (2) to place in effect individual pay increases for merit (or decreases for lack of merit), provided always in both cases that the minimum wage in each classification, as set by the prevailing rate in the area, was maintained."

 The order of the Labor Board enforced by the decree of this court directed the company to bargain with respect to rates of pay and wages as well as with respect to certain other matters; and what was done by the company was certainly no compliance with this order. For it to announce that it intended to pay and would have to pay the minimum rate prevailing in the area but would reserve to itself the right to change wages at any time unilaterally because of changed economic conditions was not bargaining at all but a mere declaration of policy on its part. While the company was not bound to enter into any particular agreement with regard to wages, it could not refuse to bargain with regard thereto. It argues that it was not bound to enter into the agreement proposed by the union to maintain the status quo as to wages for a year unless a change could be agreed upon. This is true; but its refusal to continue the status quo, or any other rate, for any appreciable period amounted to an intransigent refusal to bargain at all as to the wage rate. Many other employers, even when there are disputes about the wage rate, have been able to reach agreements with their employees with regard thereto. We are not impressed with the argument that the company here could not offer an agreement as to rates where there was no dispute. Collective bargaining means something more than mere talk by those who have decided in advance not to bargain at all with respect to so vital a matter as the rate of wages and to reserve to themselves the right to control same by unilateral action. As said by Judge Lindley speaking for the Court of Appeals of the 7th Circuit in Singer Mfg. Co. v. N.L.R.B., 7 Cir., 119 F.2d 131, 136: "The Board's position is that an employer who insists upon reserving the right to act unilaterally and of its own will alone upon matters involving legitimate collective bargaining and denies the employees any contractual provision for opportunity to bargain collectively with regard thereto thereby refuses to bargain collectively within the meaning of the Act. With this reasoning we agree." See also Great Southern Trucking Co. v. N.L.R.B., 4 Cir., 127 F.2d 180; Aluminum Ore Co. v. N.L.R.B., 7 Cir., 131 F.2d 485, 147 A.L.R. 1; Globe Cotton Mills v. N.L.R.B., 5 Cir., 103 F.2d 91.

 And we think also that the refusal of the company to bargain with respect to merit increases in pay was a refusal to bargain within the meaning of the statute and the order of this court. Merit pay where there are a number of employees means more than a gratuity or bonus paid to an occasional employee whom the company wishes to favor on account of his loyalty or efficiency. It means necessarily the formulation and application of standards; and such standards are proper subjects of collective bargaining. Collective bargaining with respect to wages might well be disrupted or become a mere empty form if the control over the wages of individual employees were thus removed from the bargaining area. Directly in point is the decision of the Court of Appeals of the Sixth Circuit in N.L.R.B. v. J. H. Allison & Co., 6 Cir., 165 F.2d 766, 768, 3 A. L.R.2d 990, where the court speaking through Judge Martin said:

"Respondent argues that it is common practice for employers to grant merit increases; and that, unless there is an express stipulation in the bargaining agreement to the contrary, the employer may at any time during the term of the contract give an individual employee a merit increase within 'the network' of the wage

scale negotiated between the employer and the union representing its employees as bargaining agent. It is pointed out that, should there be a charge of discrimination —which there is not in this case—the matter would fall within the ambit of grievance procedure.

"In our judgment, the argument of the respondent will not stand. We think the logical deduction to be drawn from the opinions of the Supreme Court is that by virtue of the National Labor Relations Act the obligation of the employer to bargain collectively with representatives of its employees with respect to wages, hours and working conditions, includes the duty to bargain with such representatives concerning individual merit wage increases. The labeling of a wage increase as a gratuity does not obviate the fact that a gratuitous increase on the basis of merit does, in actuality, effectuate changes in rates of pay and wages, which are by the Act made the subject of collective bargaining."

Very much in point also is the decision of the Supreme Court in Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 585, 88 L.Ed. 788, wherein was involved the validity of certain individual pay increases. The court speaking through Mr. Justice Jackson said: "Collective bargaining was not defined by the statute which provided for it, but it generally has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States. From the first the position of labor with reference to the wage structure of an industry has been much like that of the carriers about rate structures. It is insisted that exceptional situations often have an importance to the whole because they introduce competitions and discriminations that are upsetting to the entire structure. Hence effective collective bargaining has been generally conceded to include the right of the representatives of the unit to be consulted and to bargain about the exceptional as well as the routine rates, rules, and working conditions. Collective bargains need not and do not always settle or embrace every exception. It may be agreed that particular situations are reserved for individual contracting, either completely or within prescribed limits. Had this proposed rate of pay been submitted to the collective bargaining process it might have been settled thereby or might have resulted in an agreement that the company should be free to negotiate with the agents severally. But the company did not observe the right of the representatives of the whole unit to be notified and dealt with concerning a matter which from an employee's point of view may not be exceptional or which may provide a leverage for taking away other advantages of the collective contract."

In Medo Corp. v. N.L.R.B., 321 U.S. 678, 64 S.Ct. 830, 833, 88 L.Ed. 1007, the Supreme Court, in holding negotiations with individual employees to be unfair labor practices where they were represented by a bargaining agent, said: "That it is a violation of the essential principle of collective bargaining and an infringement of the Act for the employer to disregard the bargaining representative by negotiating with individual employees, whether a majority or a minority, with respect to wages, hours and working conditions was recognized by this Court in J. I. Case Co. v. [National] Labor [Relations] Board, 321 U.S. 332, 64 S.Ct. 576 [88 L.Ed. 762]; cf. Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S. Ct. 582 [88 L.Ed. 788]; see also National Licorice Co. v. Labor Board, 309 U.S. 350, 359–361, 60 S.Ct. 569, 575, 576, 84 L.Ed. 799. The statute guarantees to all employees the right to bargain collectively through their chosen representatives. Bargaining carried on by the employer directly with the employees, whether a minority or majority, who have not revoked their designation of a bargaining agent, would be subversive of the mode of collective bargaining which the statute has ordained, as the Board, the expert body in this field, has found. Such conduct is therefore an interference with the rights guaranteed by § 7 and a violation of § 8(1) of the Act." See also May Dept. Stores Co. v. N.L.R. B., 326 U.S. 376, 383, 66 S.Ct. 203, 90 L.Ed.

145; J. I. Case Co. v. N.L.R.B., 321 U.S. 332, 339, 64 S.Ct. 576, 88 L.Ed. 762.

For the reasons stated we think that respondents must be held in contempt of court. In view of the fact, however, that they have apparently acted on advice of counsel and under a mistaken view of the law and not in willful disobedience of the court's decree, we shall not impose fine or imprisonment upon them or direct the institution of proceedings in criminal contempt, but shall merely, for the present, tax them with the costs of the court in this proceeding and give them an opportunity to purge themselves of the contempt by showing within ninety days of this date that they have bargained in good faith with the union as directed by the Board's order and the court's decree. In making the showing here required, respondents should bear in mind the importance of negotiating with the union a written collective trade agreement as to all matters upon which agreement can be had. As said by this court in N.L.R.B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 638:

"The purpose of the written trade agreement is not primarily to reduce to writing settlements of past differences, but to provide a statement of principles and rules for the orderly government of the employer-employee relationship in the future. The trade agreement thus becomes, as it were, the industrial constitution of the enterprise, setting forth the broad general principles upon which the relationship of employer and employee is to be conducted. Wages may be fixed by such agreements and specific matters may be provided for; but the thing of importance is that the agreement sets up a modus vivendi, under which employer and employee are to carry on. It may be drawn so as to be binding only so long as both parties continue to give their assent to it; but the mere fact that it provides a framework within which the process of collective bargaining may be carried on is of incalculable value in removing the causes of industrial strife. If reason and not force is to have sway in industrial relationships, such agreements should be welcomed by capital as well as by labor. They not only provide standards by which industrial disputes may be adjusted, but they add dignity to the position of labor and remove the feeling on the part of the worker that he is a mere pawn in industry subject to the arbitrary power of the employer.

"The importance of the trade agreement in the process of collective bargaining is universally recognized by economists. * * * Walton H. Hamilton in the Encyclopedia of the Social Sciences vol. II, p. 628 * * * has this to say of the nature of the trade agreement: 'The process of collective bargaining results, not in a labor contract, but in a trade agreement. This imposes no obligation upon the employer to offer or upon the laborers to accept work; it guarantees neither to the employers workmen nor to the laborers jobs. It is nothing more than a statement of the conditions upon which such work as is offered and accepted is to be done. The contract of employment is still between the individual employer and the individual employee, though the provision of the order in which men are to be taken on and laid off may give to or withhold from laborers a chance to dispose of their services. It is through the trade agreement, which is subsumed in the labor contract, that collective bargaining becomes an agency of industrial order.'

"And that Congress contemplated that collective bargaining should be pursued with the end and aim of arriving at trade agreements, so important to giving labor a proper voice in industry, does not admit of doubt. House Report No. 1147, 74th Congress, 1st Sess. p. 20, says: 'As has frequently been stated, collective bargaining is not an end in itself; it is a means to an end, and that end is the making of collective agreements stabilizing employment relations for a period of time, with results advantageous both to the worker and the employer.' Senate Report No. 573, 74th Congress, 1st Sess. p. 13, says: 'The object of collective bargaining is the making of agreements that will stabilize busi-

ness conditions and fix fair standards of working conditions.' "

Order will enter adjudging the respondents in contempt of court, taxing them with the court costs in this contempt proceeding and allowing them ninety days within which to purge themselves of the contempt by showing that they have bargained with the union as directed by the Board's order and this court's decree.

SOPER, Circuit Judge (dissenting in part).

The one fact which stands out above all others in this case is that there is no accusation or even suspicion of unfair or discriminatory treatment of employees by the Berkley Machine Works and Foundry Company, although its conduct was under constant and critical observation during the four years when it was engaged in bargaining with the International Association of Machinists Lodge No. 11. There was no disagreement as to wages or hours of work or working conditions, and no strike; in other words, the men were satisfied. The complaint relates to the failure of the company to reach and sign an agreement with the union to maintain existing conditions, and hence it may fairly be said that the controversy relates to the procedure of collective bargaining rather than to working conditions prevailing in the employer's plant.

There can be no doubt that there were prolonged negotiations between the parties for a period of more than four years, or that the company acted in good faith throughout this period.[1] The special mas-

---

1. It appears from the master's opinion that there were at least ten or twelve meetings of the Company with the union from June 1945 to September 1949 when the contempt proceedings began. The company complied with the requests of the union for conferences with promptness—once on the very day of the request, once the very next day, and once within three days. On three occasions there was some delay due to involvements of company counsel in litigation elsewhere.

All told there was an aggregate of thirty-four months of silence. Three of the most extended periods of inactivity (one in 1945–46, one in 1947–48 and one in 1949) occurred when the Labor Board was engaged in investigating the case. Both parties seized upon this fact to justify their silence. A fourth period of four months followed the company's letter of February 25, 1946 in which the company specifically objected in writing to certain union proposals and offered to renew negotiations. A fifth period of three months followed the company's counter-proposal of August 13, 1946 in which the union was advised that the company awaited its further action. A sixth period of three and a half months followed the union's proposed modifications to the counter-proposal. This interval resulted from a mutual misunderstanding, both parties being equally blameless or equally to blame. A seventh period of silence which merged into the period when the Labor Board was contemplating contempt proceedings, followed the union's request for a conference in November, 1948. During the four years of negotiations, there were some half-dozen shifts in union personnel directly in charge. The master attributed the thirty-four months of quiet to this fact more than any other. The unfamiliarity of the succeeding officers with what had gone before served to produce confusion, uncertainty and misunderstandings that never should have existed. It is not unreasonable to assume that the prevailing satisfactory wages and working conditions relieved both the company and the union of employee pressure to come to agreement without delay.

The union made about five different proposals in trying to reach agreement but these can be reduced in substance to fewer in number. The first three (one in the summer of 1945, one in February 1946 and one in July 1946) were identical save for the fact that the third one eliminated the union shop provision. The fourth (November 1946) was a modification of the company's counter-proposal. The fifth (November 1948) represented no material departure from the fourth save that it dropped the demand for vacations with pay. In the course of the negotiations the union made concessions, among which were the withdrawal of its requests for union shop, for seven paid holidays, for double-time on Sunday, for call-in pay, for separation pay and for limitation on the number of apprentices.

The company stated its objections to the several union proposals in the numerous conferences and twice stated them specifically in writing—once in February 1946 and once in June 1946. The

ter found that the company acted in good faith and the court agrees; but the court finds that the special master and the company's attorney acted under a mistake of law in supposing: (1) that the company was not obliged to bargain with the union in respect to the practice of granting increased pay in individual cases as a reward for meritorious service; and (2) that the company was not obliged to execute an agreement binding it to maintain existing rates of pay for a specified period of time.

I agree with the conclusion of the court as to the first matter. Individual merit increases are obviously desirable from the company's standpoint but they are susceptible of misuse as an expedient to change an agreed rate of pay or to minimize the function of the union as the bargaining representative of the majority of the employees. They are accordingly looked upon with suspicion by the union whose tendency is to hold individual effort to the level of mediocrity in the belief that this is best for the body of the workers as a whole. Hence there exists a suitable field for negotiating which the employer cannot refuse to enter, as shown by the decisions which are cited in the opinion of the court. It may not be said, perhaps, that there are no circumstances under which an employer may grant an increase of pay or better working conditions to an individual employee as a reward of merit without bargaining with the union, but it is clear that an employer may not refuse altogether to treat with the union in this area of employer-employee relationship.

I am, however, constrained to differ with the holding on the second point not only in the statement of facts and the applicable law in the instant case, but also

with respect to the unreasonable restraint which would be imposed upon the right of an employer to conduct his business in a prudent and lawful manner if the holding should be adopted as a general rule. We must take the facts from the report of the special master, for under the Federal Rules of Civil Procedure, rule 53(e) (2), 28 U.S. C.A. and the decision of this court in N. L. R. B. v. Standard Trouser Co., 4 Cir., 162 F.2d 1012, the master's findings are binding upon us unless clearly erroneous, and the court does not find palpable error in this instance. The petition of the Board charged that the company refused to negotiate about any contractual provision which should bind it as to rates of pay, wages, hours and working conditions, and insisted upon maintaining full freedom of action as to such matters. In respect to this specification the special master made the following findings of fact:

"This specification deals with wages, hours and other working conditions. The matter of hours has been dealt with in the preceding specification. Counsel has not pointed out what 'other conditions' there are about which the Company refused to negotiate or with respect to which it insisted on full freedom of action. The matter of rates of pay and wages alone remains for consideration.

"It should be said at the outset that uniformity of wages in the several classifications and the Company's existing practice of granting individual merit increases constituted a basic disagreement underlying all other disagreements during the entire negotiations. None of the prolonged and heated discussion of other issues was ever divorced from these points of primary concern to each of the parties.

---

company made its counter-proposal in August 1946, and the union modification of this counter-proposal became the prime subject of subsequent negotiation. In February 1948 the company reviewed, for the benefit of the Labor Board, the prior conferences and negotiations and it expressed the view that no agreement could be reached unless the union was prepared to yield on the matter of non-uniformity of individual pay raises in

the sole discretion of the company and on the matter of vacations. Union proposals subsequent to this communication never once yielded on the first matter and its demands of the company for counter-proposals were not heeded. The master found that the position of the company in January 1949 was perfectly clear to the union; hence the union demands for counter-proposals did not necessarily warrant action by the company.

"The contention of the Board in this respect is primarily based upon the initial error that the Company refused to bind itself as to any minimum wage scale applicable to all employees. That such is wholly inaccurate clearly appears from the admissions of the Union representatives who successively conducted the negotiations for the Union, irrespective of the Company proof on that point. The Company clearly and repeatedly stated its agreement to bind itself to a minimum rate of pay in each classification equal to the prevailing rate in the area. The issue in dispute was the right of the Company without consulting the Union (1) to lower its general and existing scale of pay if economic conditions produced a reduction in the prevailing wage in the area, and (2) to place in effect individual pay increases for merit (or decreases for lack of merit), provided always in both cases that the minimum wage in each classification, as set by the prevailing rate in the area, was maintained. The Company's position was not taken in any sense as a subterfuge or for the purpose of controlling wage rates in general.

"The reason for the Company's position was that its actual wage rates were already above the prevailing rates in the area and that in intended to continue them so long as it could do so, economic conditions permitting, and that its policy of individual wage differentials for merit and ability, above its regular rates, was a long standing practice, both sound, reasonable and just.

"The change in economic conditions anticipated by the Company was the cessation of war-work, in which it had been chiefly engaged for governmental agencies, and an early return to civilian production, in competition for which it might not be able to continue its wage rates 'in effect since the Union was certified.' It agreed that it could and would maintain the prevailing rates in the area. It was unwilling to bind itself for the period of a year to the existing rates, nor place itself in a position where union agreement was necessary during the year in order to reduce its existing rates, if the specified economic conditions produced a reduction in the prevailing area rates during that year.

"That such was the issue is clear from the evidence."

In view of these findings it is quite incorrect to say that the company was unwilling to bind itself to pay any specific rate for any specified length of time or that it refused to continue the status quo or any other rate for any appreciable period. The company was entirely willing to bind itself to pay a minimum rate of pay in each classification equal to the prevailing rate in the area. It was unwilling, amidst the uncertainties of the emergency of war, to agree to continue to pay a higher rate than its competitors for any definite period; and it took this position in good faith, fearing that a cessation of war work would render the maintenance of existing conditions impracticable. There is no power in the Labor Board or in this court to compel an employer to sign an employment contract against his better business judgment exercised in good faith, and his refusal to comply under such circumstances should be ascribed rather to the reasonable desire to save himself from loss than to a stubborn refusal to perform his duty under the statute. The law was correctly stated by Judge Lindley in the Singer case, cited in the opinion, where he said, 119 F.2d 137 "Petitioner (the employer) could not be compelled to enter into a contract which did not reduce wages or which bound it not to make a reduction in the future." Since this is the established rule, this court has no power to direct the company to purge itself by entering into an agreement to maintain existing conditions for any specified length of time.