BROTHERHOOD OF RAILWAY & STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS & STATION EMPLOYEES et al. v. ATLANTIC COAST LINE R. CO.

No. 6489.

United States Court of Appeals Fourth Circuit.

Argued Nov. 13, 1952.

Decided Jan. 5, 1953.

See also, D.C., 88 F.Supp. 115.

Clarence M. Mulholland, Toledo, Ohio (J. Ruffin Bailey, Raleigh, N. C., Edward J. Hickey, Jr., and Mulholland, Robie & Hickey, Washington, D. C., on the brief), for appellants.

M. V. Barnhill, Jr., Wilmington, N. C. (Charles Cook Howell, Wilmington, N. C., and F. S. Spruill, Rocky Mount, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a decree on the merits denying an injunction and dismissing a suit instituted by a railroad brotherhood against a railroad to enforce collective bargaining under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. The suit was instituted by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (hereafter referred to as the brotherhood), which had been certified by the National Mediation Board as bargaining agent for a large group of employees pursuant to the provisions of that act. The brotherhood alleged that the railroad refused to bargain in good faith with respect to about 850 of the employees embraced within the group and asked that it be required to do so. The trial judge dismissed the suit on the ground that such failure to bargain had not been established. In this we think there was error.

Since 1922 the brotherhood has represented a large group of the clerical employees of the railroad, 5,000 or more in number, and has negotiated agreements with the railroad concerning wages, hours, rules and conditions of work, but has never been able to have the provisions of the agreements extended to the 850 employees here involved, who comprise the "while col-

lar" group of the clerical employees. Efforts directed to this end were made by the brotherhood from time to time but the railroad would never agree that the agreements be made applicable to these employees, who were not represented by the brotherhood prior to 1947. In 1943 the brotherhood made an earnest effort to have the excepted employees included in the agreement and the matter was fully discussed between its representatives and those of the railroad, who opposed their inclusion on the ground that the employees did not desire to be included and that many of them occupied confidential positions and were specially trained for their work. Since the brotherhood did not represent the excepted employees as bargaining agent at that time, it was in no position to insist on bargaining in their behalf. It accordingly concluded an agreement with the railroad in 1944 covering the employees for whom it was the authorized bargaining agent and excluding the others, but immediately applied to the National Mediation Board to designate it as the bargaining agent of the entire craft of clerical employees including those who had been excluded from the agreement.

The National Mediation Board accepted jurisdiction of the case made by the brotherhood's petition and in 1947, after excluding certain employees with duties of an administrative and supervisory character, included all the other clerical employees in a bargaining unit and conducted an election for determining the bargaining representative for the unit. The brotherhood was selected as bargaining representative in this election and was duly certified as such by the board. The brotherhood thereupon submitted to the railroad a proposal that the employees who had been theretofore excluded from the bargaining agreement be subjected to certain of its rules. Representatives of the railroad met with representatives of the brotherhood at the request of the latter and listened to their proposal, but declined to accept it or to make any counter proposal. They made no specific objection to any of the proposed rules but declined to consider applying them to any of the excluded employees without sug-gesting any rules that would be acceptable or giving any reason other than that the matter had been considered in prior conferences and the railroad was not willing to change its position that these employees should be excluded from the collective bargaining agreements. The position of the railroad was, and is, that the positions held by the excepted employees are of such a character that the collective bargaining process cannot properly be applied to them but that their rates of pay, rules and working conditions should be determined, not by collective bargaining, but by unilateral action on the part of the railroad. It argues that it fulfilled its duty to bargain collectively when it met with the representatives of the brotherhood, declined their proposals with respect to the excepted employees and stated that it was always willing to talk with them and listen to what they had to say.

Upon failure of the brotherhood to make any headway towards bargaining with the railroad for these employees, it invoked the services of the National Mediation Board, which assigned a mediator to the case and, upon his failure to accomplish anything, proposed arbitration. This was accepted by the brotherhood but declined by the railroad. This suit was then instituted by the brotherhood to enforce collective bargaining. Certain of the excluded clerical employees sought to intervene in order to challenge the right of the brotherhood to represent them, but their petition to intervene was denied and this was affirmed on appeal. Rose v. Brotherhood of Railway and Steamship Clerks, 4 Cir., 181 F. 2d 944, 946. The affirmance was based upon the ground that the effect of the Railway Labor Act was to vest exclusive jurisdiction in the Mediation Board over the certification of bargaining agents, the determination of bargaining units and the classification of employees for the purposes of collective bargaining. We said:

"In the light of the decisions of the Supreme Court, there can be no doubt that the effect of this statute was to vest in the Mediation Board exclusive jurisdiction over the certification of bargaining agents, the determination

of bargaining units and the classification of employees for the purposes of bargaining. And it is equally clear that the exercise of discretion by the board with respect to such matters is not subject to review by the courts. Switchmen's Union of North America v. National Mediation Board, 320 U. S. 297, 64 S.Ct. 95, 88 L.Ed. 61; General Committee etc. v. M[issouri]-K-T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; Brotherhood of Railway & Steamship Clerks etc. v. United Transport Service Employees, 320 U.S. 715, 64 S.Ct. 260, 88 L.Ed. 420; Order of Railway Conductors of America, etc. v. Penn. R. Co., 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154; Steele v. L[ouisville] & N. R. Co., 323 U.S. 192, 205, 65 S.Ct. 226, 89 L.Ed. 173. And see Slocum v. D[elaware] L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577 [94 L.Ed. 795]."

■ What we had to say in the decision on that appeal disposes of any question as to whether the 850 employees here involved were properly included in the bargaining unit represented by the brotherhood, and we think it perfectly clear that the railroad did not fulfill its statutory duty to bargain with them, or with the brotherhood for them. The applicable provisions of the statute, 45 U.S.C.A. § 152, subds. First and Ninth, are as follows:

"First. It shall be the duty of all carriers, their officers, agents, and employees *to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions,* and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

"Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. *Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. * * *"* (Italics supplied.)

It was the duty of the railroad under this statute to bargain in good faith with the brotherhood with respect to "rates of pay, rules and working conditions" for the 850 as well as for the other clerical employees; and this duty was not discharged by bargaining with respect to the others and excepting these on the ground that their pay, rules and working conditions were not proper subjects of collective bargaining. We have recently held that the duty to bargain collectively is not satisfied by bargaining which excludes a portion of the subject matter as to which bargaining is required. N.L.R.B. v. Berkley Machine W. & F. Co., 4 Cir., 189 F.2d 904. It is equally clear that the duty is not satisfied when a large group of employees embraced within a bargaining unit is excluded from the benefit of the bargaining process.

■■ We do not mean to say that all members of the bargaining unit should be subjected to the same rules and we do not understand that the brotherhood has ever so contended. Collective bargaining may properly provide different rules and conditions as well as different wages for different classes of employees. As was said by the Supreme Court in Steele v. Louisville & N. R. Co., 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173: "Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are

within the scope of the bargaining representation.of a craft, all of whose members are not identical in their interest or merit." There is manifestly no collective bargaining with respect to a group of employees, however, when all the proper subjects of collective bargaining affecting them are reserved to unilateral action on the part of the employer.

It is argued that the negotiations between the brotherhood and the railroad in 1943 and prior thereto showed collective bargaining with respect to the 850 employees here involved; but the trouble is that these negotiations did not evidence bargaining on the part of the railroad with respect to these employees but refusal on its part to include them within the ambit of the bargaining process. It is also argued that the railroad satisfied the requirement to bargain in receiving the proposal of the brotherhood to make certain rules applicable to the 850 employees and in saying that it would listen to the bargaining agent in the future whenever it had proposals to make; but it is perfectly clear from the evidence that the railroad was making no effort whatever to bargain with respect to the rates of pay, rules and working conditions applicable to these employees, as required by statute, but, on the contrary, was adhering to the position theretofore taken that collective bargaining was not properly applicable to them. An employer who assumes an intransigent attitude in refusing to bargain collectively manifestly does not meet the requirements of the statute merely because he listens politely to an offer and exercises politeness in declining it without making any counter offer or indicating any basis upon which he is willing to bargain. As said by this court in N.L.R.B. v. Berkley Machine W. & F. Co., supra, 4 Cir., 189 F.2d 904, 907, where the company refused to enter into any agreement with respect to wages:

"While the company was not bound to enter into any particular agreement with regard to wages, it could not refuse to bargain with regard thereto It argues that it was not bound to enter into the agreement proposed by the union to maintain the status quo as to wages for a year unless a change could be agreed upon. This is true; but its refusal to continue the status quo, or any other rate, for any appreciable period amounted to an intransigent refusal to bargain at all as to the wage rate. * * * Collective bargaining means something more than mere talk by those who have decided in advance not to bargain at all with respect to so vital a matter as the rate of wages and to reserve to themselves the right to control same by unilateral action. As said by Judge Lindley speaking for the Court of Appeals of the 7th Circuit in Singer Mfg. Co. v. N.L.R.B., 7 Cir., 119 F.2d 131, 136: 'The Board's position is that an employer who insists upon reserving the right to act unilaterally and of its own will alone upon matters involving legitimate collective bargaining and denies the employees any contractual provision for opportunity to bargain collectively with regard thereto thereby refuses to bargain collectively within the meaning of the Act. With this reasoning we agree.' See also Great Southern Trucking Co. v. N.L.R.B., 4 Cir., 127 F.2d 180; Aluminum Ore Co. v. N.L.R.B., 7 Cir. 131 F.2d 485, 147 A.L.R. 1; Globe Cotton Mills v. N.L.R.B., 5 Cir., 103 F.2d 91."

In the case from which we have just quoted we pointed out the importance of negotiating a written trade agreement as the end of collective bargaining, quoting at length from our decision in N.L.R.B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 638, as follows:

"The purpose of the written trade agreement is, not primarily to reduce to writing settlements of past differences, but to provide a statement of principles and rules for the orderly government of the employer-employee relationship in the future. The trade agreement thus becomes, as it were, the industrial constitution of the enterprise, setting forth the broad general principles upon which the relationship of employer and employee is to be conducted. Wages may be fixed by such agreements and specific matters may

be provided for; but the thing of importance is that the agreement sets up a modus vivendi, under which employer and employee are to carry on. It may be drawn so as to be binding only so long as both parties continue to give their assent to it; but the mere fact that it provides a framework within which the process of collective bargaining may be carried on is of incalculable value in removing the causes of industrial strife. If reason and not force is to have sway in industrial relationships, such agreements should be welcomed by capital as well as by labor. They not only provide standards by which industrial disputes may be adjusted, but they add dignity to the position of labor and remove the feeling on the part of the worker that he is a mere pawn in industry subject to the arbitrary power of the employer.

"The importance of the trade agreement in the process of collective bargaining is universally recognized by economists. * * * Walton H. Hamilton in the Encyclopedia of the Social Sciences vol. II, p. 628 * * * has this to say of the nature of the trade agreement: 'The process of collective bargaining results, not in a labor contract, but in a trade agreement. This imposes no obligation upon the employer to offer or upon the laborers to accept work; it guarantees neither to the employers workmen nor to the laborers jobs. It is nothing more than a statement of the conditions upon which such work as is offered and accepted is to be done. The contract of employment is still between the individual employer and the individual employee, though the provision of the order in which men are to be taken on and laid off may give to or withhold from laborers a chance to dispose of their services. It is through the trade agreement, which is subsumed in the labor contract, that collective bargaining becomes an agency of industrial order.'

"And that Congress contemplated that collective bargaining should be pursued with the end and aim of arriving at trade agreements, so important to giving labor a proper voice in industry, does not admit of doubt. House Report No. 1147, 74th Congress, 1st Sess. p. 20, says: 'As has frequently been stated, collective bargaining is not an end in itself; it is a means to an end, and that end is the making of collective agreements stabilizing employment relations for a period of time, with results advantageous both to the worker and the employer.' Senate Report No. 573, 74th Congress, 1st Sess. p. 13, says: 'The object of collective bargaining is the making of agreements that will stabilize business conditions and fix fair standards of working conditions.' "

We think it perfectly clear from this record that the railroad has not engaged in good faith bargaining with respect to pay, rules and conditions of work of these 850 employees as contemplated by the Railway Labor Act and that the injunctive power of the court should be exercised to require it to do so. Virginian R. Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, affirmed 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789. We do not, of course, suggest the terms of any agreement as to any employee or group of employees; for it is not the function of the courts to make agreements for the parties or to force them to accept agreements which they are unwilling to accept. What we do, and all that we do, is direct that the railroad bargain collectively and in good faith with the brotherhood with respect to the pay, rules and conditions of work of these 850 employees as required by the terms of the Railway Labor Act. If such bargaining is carried on in good faith, there is no reason to think that it will not result in agreements that will be mutually saisfactory as in the case of other employees.

For the reasons stated, the decree appealed from will be reversed and the case will be remanded with direction to the District Court to enter a decree in accordance with this opinion.

Reversed and remanded.