**NATIONAL FRESH FRUIT & VEGETABLE COMPANY and Quality Banana Co., Inc., Petitioners-Cross Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 77–1274.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1978.

Rehearing Denied Feb. 27, 1978.

William F. Banta, New Orleans, La., for petitioners-cross respondents.

Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, William R. Stewart, Alan Banov, Attys., N. L. R. B., Washington, D. C., for N. L. R. B.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

National Fresh Fruit & Vegetable Co. and Quality Banana Co., Inc. (the Company), petitions this court to review and set aside an order of the National Labor Relations Board.[1] The Board found that the Company violated section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) & (1), by insisting to impasse on a non-mandatory subject of bargaining and section 8(a)(3) & (1) of the Act by failing to reinstate unfair labor practice strikers immediately upon their unconditional offers to return to work. The situation presented by this appeal is somewhat unusual in that the Board accepted the credibility resolutions and factual findings of the Administrative Law Judge but disagreed with his conclusions drawn from those findings that the Company did not bargain to impasse and that the strikers were economic, not unfair labor practice strikers. The Administrative Law Judge found that the strikers has not been permanently replaced by the Company and were therefore entitled to immediate reinstatement upon unconditional application to return to work. He therefore awarded the striking employees backpay for the period between their request for reinstatement and the Company's offer of reinstatement. We affirm that decision. Accordingly the order of the Bord will not be enforced.

I. This case stems from an abortive attempt in April of 1975 between the Company and the Union (General Drivers, Ware-

---

1. 227 NLRB No. 293 (1977).

housemen and Helpers Local Union 968, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America) to negotiate a new collective bargaining agreement.[2]  On April 30, 1975 the Company's representative, Clarence Chadwick, and the president of the Union, Willard Manuel, resolved their differences on the wage issue and reached an agreement on a contract.  That afternoon Manuel called Chadwick to inform him that the contract had been approved 9 to 5 by the Union.  A short time later, however, Manuel told Chadwick that the contract had not in fact been ratified and that he, Manuel was resigning from the local.  The Company thereafter filed an unfair labor practice charge with the Regional Director, which was dismissed on the ground that the contract was ineffective because it had not been ratified by the Union.[3]  The Company's appeal to the NLRB was denied.  On November 18, after a hiatus of almost seven months, during which time the Company was unsuccessfully prosecuting its charge, negotiations between the Company and the Union resumed.  During these negotiations the Union advanced a number of proposals with respect to wages, pension plans, sick leave, and funeral pay, not included in the April contract.  The Company countered by proposing that the shipping and receiving clerk classification be removed from the bargaining unit, claiming that the present system of contract bidding made it difficult to fill the positions with qualified personnel.

The parties resumed their negotiations the following day, each side presenting so called final proposals.  The Company remained firm on its April 30 offer and demanded that the shipping and receiving clerks be removed from the bargaining unit.  The Union insisted on an increased economic package and opposed the Company's demands on the issue of shipping and receiving clerks.

On November 22, the Union representatives informed its members of the Company's proposals.  The membership unanimously rejected the offer and voted to go on strike.

The strike began on November 23.  On December 1, the parties met with a Federal mediator but were unable to resolve the issues of wages, retroactive pay, sick leave, a pension plan and the deletion of the shipping and receiving clerks from the bargaining unit.  After the meeting Chadwick met with John Daigle, chief negotiator for the Union, and James E. Jackson, the secretary treasurer-business manager of the Union to attempt to settle their differences.  The Union wanted the strikers returned to work and a retroactive wage increase but offered to let the Company select the shipping and receiving clerks if the clerks were allowed to remain within the unit.  Chadwick stated that he had openings for only ten strikers since the other positions had been filled.  This offer was unacceptable to the Union.  The parties discussed the same proposals by phone on December 8, but were still unable to reach an agreement.

On February 4, 1976 the Union wrote the Company asking for reinstatement of the strikers.  The Company granted reinstatement on February 26, 1976.

II.  The standard of review of Board decisions is set forth in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950).  There, the Court stated that:

> Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.
>
> *       *       *.       *       *       *
>
> A formula for judicial review of administrative action may afford grounds for certitude but cannot assure certainty of application.  Some scope for judicial dis-

---

2.  The Company's employees have been represented by the Union since 1967.

3.  There were approximately 60 employees in the unit.  The 9 to 5 vote apparently refers to the vote taken among the members of the Union Committee.

**1334**

cretion in applying the formula can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata. The ultimate reliance for the fair operation of any standard is a judiciary of high competence and character and the constant play of an informed professional critique upon its work.

Since the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment.

. . .

\*    \*    \*    \*    \*    \*

Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial functions. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.* at 488–90, 71 S.Ct. at 465, 95 L.Ed. at 468–69.

■ It is well established that to insist to impasse upon a non-mandatory subject of bargaining constitutes an unfair labor practice in violation of section 8(a)(5) of the Act. *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2

L.Ed.2d 823, 829 (1958); *Newspaper Production Co. v. NLRB*, 503 F.2d 821, 828 (5th Cir. 1974); *Hess Oil & Chemical Corp. v. NLRB*, 415 F.2d 440, 443 (5th Cir. 1969), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970). The size of an established bargaining unit is a non-mandatory bargaining subject. *See, e. g., Hess Oil & Chemical Corp., supra* at 444–45.

■ The crucial question presented by this appeal is the degree to which a party may advance a non-mandatory subject before the advancement of that subject rises to the level of an impermissible insistence. A resolution of this question necessarily depends upon a determination of the party's demonstrated attitude concerning the proposed subject. On the basis of the record and the history of the bargaining relationship between the Company and the Union, we conclude that the Company did not bargain to impasse upon the shipping and receiving clerk issue.

Initially it should be noted that the Company and Union have enjoyed a successful and harmonious bargaining relationship since 1967, when the Company first recognized the Union.[4] During past contract negotiations the practice of reducing or expanding the bargaining unit was established between the parties.[5] In fact, during the November 18 negotiations the Union proposed that the dispatcher classification be restored to the bargaining unit and that a new classification for out-of-state trucking runs be established. Thus, it was not unusual for the parties to introduce and negotiate changes in the size of the unit. And while this previous pattern of bargaining on non-mandatory subjects does not ipso facto make all succeeding negotiations mandatory, it does tend to demonstrate that unit size was a readily negotiable subject between the parties.

---

4. Before he joined management Chadwick had been a member of Local 968 for 10 years during which period he had served some time in the position of steward. He had previously negotiated three separate contracts and a wage opener with Local 968 for the Company.

5. In past negotiations the classifications of inside salesman and dispatcher were deleted from the bargaining unit and the classification of dockmen added.

Evidence concerning the degree of the Company's commitment to the removal of the shipping and receiving clerks from the bargaining unit can be found by examining the April contract negotiations. There the only issue was wages. The Company offered a 22 cents an hour increase per year for three years. The Union countered with a proposal of 50 cents the first year and 40 cents the second and third years. A compromise of 35 cents the first year and 30 cents in each of the succeeding years was reached between negotiators for the respective parties. The Company was led to believe by the Union President that it had a contract only to subsequently discover that the membership had rejected the agreement. In the intervening months between the rejection of the contract and the resumption of negotiations in November the employees worked without a contract and were paid according to the wage scale under the expired contract.

In light of this history of the bargaining relationship of the parties, which we feel has significant bearing on the question of impasse, we now turn to an examination of the degree to which the Company advanced its proposal for eliminating shipping and receiving clerks from the bargaining unit.

Testimony by the Company's chief negotiator, Chadwick, characterized the shipping and receiving clerk proposal as a bargaining tactic designed to counter the substantial number of new proposals raised by the Union at the November 18 meeting. He testified that:

And I told Mr. Daigle that I felt that he had thrown a lot of stuff at me that we weren't expecting, and that since he had, we were going to throw a little something on the table for him. And it was a goodie and it was a biggie, and that is shipping and receiving clerk.

\* \* \* \* \* \*

[W]hen we first proposed it, when we first proposed the situation, it was a kidding around thing, and then I found that I might be able to use that for him to get off of his selling the business thing, or sub-contracting or whatever it was, and I

thought I would play with him for a while. . . .

According to Chadwick's testimony, discussion of this issue at the November 18 meeting lasted about 10 minutes and about five minutes at the November 19 meeting. Chadwick testified that he never informed the Union that the contract was conditional upon the shipping and receiving clerk issue and that he even told Mr. Jackson on the 1st and 8th of December that the Company would abandon its proposal on that issue.

The testimony of the Union representatives on this issue was contrary to that of Chadwick. John Daigle testified that Chadwick told him that:

If you want an agreement then that is going to be the condition of it, the shipping and receiving clerk will have to come out of the contract because we just can't operate with your people doing the work. They are costing us too much money.

Charles Ferrara, president of the Union, gave similar testimony and James Jackson testified that on neither December 1 nor December 8 did Chadwick tell him that the Company would withdraw its proposal on the shipping clerks.

The Administrative Law Judge, who observed the demeanor of these witnesses, resolved the credibility issue in favor of Chadwick. The Board accepted these credibility resolutions, but stated that:

Contrary to the Administrative Law Judge, we find that the credited testimony and the Respondent's own exhibits demonstrate that Respondent's position as to the shipping and receiving clerk categories during the period of negotiation was adamantly held and that Respondent thereby insisted to impasse upon a nonmandatory bargaining subject in violation of Section 8(a)(5) and (1).

In arriving at this decision the Board relied heavily upon Chadwick's testimony that the exclusion of the shipping and receiving clerks from the bargaining unit was a critical issue and that he was firm on it. It discounted his testimony that he was merely using the word "firm" as a bargaining tactic and the word "critical" as mean-

ing critical to the Company's operation not to the execution of a contract.[6] The Board also set out the Company's minutes of the meetings between the parties,[7] as evidence that "Respondent's continued insistence was more than superficial or that at least the Union was informed that this was so . . . ." The standard of review utilized by the Board is as follows:

> [W]e must base our findings on the evidence as a whole, even where, as here, it leads to a conclusion other than that which an Administrative Law Judge believes "makes sense."
>
> \*   \*   \*   \*   \*   \*
>
> [I]n any event the important thing is the stance which Respondent demonstrated to the Union and the mediator. Accordingly, we must look to the record in light of the Administrative Law Judge's credibility resolutions to determine for ourselves what transpired and apply the proper principals of law to those facts.

■ It is our opinion that the Board in arriving at its decision failed to adhere to its own standard in that it did not consider the "evidence as a whole", and ignored certain credibility resolutions of the Administrative Law Judge which it claimed to have accepted. As noted above, the Board based its decision on certain statements made by Chadwick and minutes taken by the Company without considering that evidence in the context of the entire series of events which gave rise to this controversy. In April the smooth course of bargaining relationship between Company and Union was disrupted by the issue of wages. The Company agreed to a contract in which shipping and receiving clerks were not excluded from the bargaining unit, suggesting, as the Administrative Law Judge concluded, that this issue was not of such importance that the Company would not agree to a contract without it. When the proposal was raised, it came only after the Union had substantially escalated its demands made during the April negotiations, including a change in the scope of the bargaining unit. And at the time it was presented John Daigle, the Union negotiator, stated that the Union representatives didn't believe the Company was serious about the issue.[8] Finally, the Board ignored the fact of the abruptness of

---

**6.** Chadwick testified that he used the word critical "not meaning it was critical to an agreement. I thought they understood it because we discussed it."

**7.** The Board's excerpt of the minutes is as follows:

Nov. 18
3:15 p. m.—Company's Proposal to Union
We are firm on our thinking on . . . Shipping and Receiving Clerks. . . .

\*   \*   \*   \*   \*   \*

[Page 3. Union withdraws request for Dispatcher Classification. Proposes a three-year contract with wages for all classifications, including Shipping and Receiving Clerk.]

COMPANY ANSWER:
Our proposal is the same as it was in April. The Company is also asking for Shipping and Receiving Clerk which we feel is a very critical issue. We will take your proposal and type it up if you want us to, but we have given you our proposal.

November 19
COMPANY'S PROPOSAL—11:15 a. m.
Shipping and Receiving Clerks be removed from the Bargaining Unit Classification.

\*   \*   \*   \*   \*   \*

UNION'S PROPOSAL—NOVEMBER 19, 1976—11:20 a. m.
Doesn't consider Shipping and Receiving Clerk a bargaining issue for the contract.
RESPONSE TO COMPANY'S PROPOSAL BY UNION:
Union rejects the Company's request for Shipping and Receiving Clerk being removed from Bargaining Unit.

\*   \*   \*   \*   \*   \*

COMPANY'S FINAL PROPOSAL—12:02 p. m.

\*   \*   \*   \*   \*   \*

No to Shipping and Receiving Classification—Wages

\*   \*   \*   \*   \*   \*

COMPANY'S FINAL PROPOSAL—Approximately 12:10 p. m.

\*   \*   \*   \*   \*   \*

That Shipping and Receiving Clerks be returned to management.

\*   \*   \*   \*   \*   \*

UNION
Apart on wages—Shipping and Receiving Clerk Wages and Shipping and Receiving Clerk are big issues.

**8.** James E. Jackson testified that at the December 1, 1975 meeting that he did not think that Chadwick was serious about removing the shipping and receiving clerks from the unit.

the strike decision. Only two negotiating sessions were held before the strike vote. Of the time spent in these sessions the shipping and receiving clerk issue occupied a total of approximately fifteen minutes. The clear implication from these facts is that the Union, which had been without a contract for seven months, struck not because of the shipping clerk issue but because of the Company's refusal to increase its wage offer and provide for retroactive pay.

The Board accuses the Administrative Law Judge of basing his decision upon subjective analysis and the Company's secret intent. We agree that this decision cannot be predicated upon either the Company's secret intentions or the Union's stated belief concerning those intentions. The Administrative Law Judge must base his conclusion upon reasonable inferences drawn from the testimony of the witnesses and the record as a whole. The Administrative Law Judge found and we concur that the Company's proposal concerning the shipping and receiving clerks was a bargaining tactic which did not evolve during the course of the negotiations into a condition precedent to its acceptance of a contract with the Union.

▇ The difficulties and dangers presented by this type of case have been summarized by Justice Harlan in *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958) (concurring in part and dissenting in part):

> Preliminarily, I must state that I am unable to grasp a concept of "bargaining" which enables one to "propose" a particular point, but not to "insist" on it as a condition to agreement. The right to bargain becomes illusory if one is not free to press a proposal in good faith to the point of insistence. Surely adoption of so inherently vague and fluid a standard is apt to inhibit the entire bargaining process because of a party's fear that strenuous argument might shade into forbidden insistence and thereby produce a charge of an unfair labor practice.

*Id.* at 352, 78 S.Ct. at 724, 2 L.Ed.2d at 830. This "vague and fluid standard" discussed by Justice Harlan does provide a less than reliable guide for a party attempting to chart a course between the twin hazards of inhibited bargaining power and an unfair labor practice charge. In this case the Company successfully negotiated those dangers. We find that the Company did not bargain to impasse on the issue of the shipping and receiving clerks. The strike was therefore, as the Administrative Law Judge found, an economic, rather than an unfair labor practice, strike.

▇ III. The Company also contends that because the strikers had been permanently replaced, that the strikers were not entitled to backpay on the grounds that the Company failed to immediately reinstate them. Unfair labor practice strikers are entitled to immediate reinstatement even if permanent replacements have been hired. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309, 317–18 (1950). Economic strikers, on the other hand, are not entitled to immediate reinstatement if permanently replaced. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614, 618 (1967). *See American Machinery Corp. v. NLRB*, 424 F.2d 1321, 1326–27 (5th Cir. 1970). The burden is upon the employer to demonstrate "legitimate and substantial business justifications" such as the hiring of permanent replacements for its failure to immediately reinstate economic strikers. *NLRB v. Fleetwood Trailer Co., supra*, 388 U.S. at 378–80, 88 S.Ct. at 545–546, 19 L.Ed.2d at 617–19; *American Machinery Corp. v. NLRB, supra* at 1326–27. *See NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027, 1035 (1967).

In the instant case the Administrative Law Judge found and we concur, that the strikers were economic strikers. The judge further found that the Company neither produced evidence that the strikers had been permanently replaced nor demonstrated any "legitimate and substantial business justification" for its failure to immediately reinstate them. He therefore ordered the Company to reimburse the employees "for any loss of earnings or other benefits at-

tributable to the delay in reinstating them to their jobs." On the basis of the record we cannot say that the Administrative Law Judge erred in concluding that the Company did not meet its burden of showing the requisite "legitimate and substantial business justification," such as the hiring of permanent replacements, for its failure to immediately reinstate the striking employees. The record does not reveal that the Company came forward with any evidence to show that there were no positions available to the strikers between February 4 and February 29.[9] The decision of the Administrative Law Judge on this issue is therefore affirmed.

IV. Finally, the Company asks this court to review the refusal of the NLRB to issue a complaint pursuant to the Company's charge of illegal conduct against the Union regarding its alleged failure to enter into the April 30 agreement. We decline to disturb the findings of the Board with respect to that issue.

Enforcement of the Board's order DENIED.

**9.** At oral argument counsel for the Company insisted that the striking employees had been permanently replaced and that the Administrative Law Judge had therefore erred in awarding backpay. We note that Company's counsel failed to set forth this matter as an issue for review in either of his briefs. The only written treatment of it is found in a footnote under counsel's Statement of the Case in his initial brief.