**TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Plaintiff,**

v.

**ARGENTINE AIRLINES, Defendant.**

**No. 79 Civ. 3077.**

United States District Court,
S. D. New York.

July 24, 1979.

---

O'Donnell & Schwartz, New York City, for plaintiff; Asher W. Schwartz, New York City, of counsel.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for defendant; Murray Gartner, Edward A. Brill, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Transport Workers Union of America ("TWU"), commenced this action against Argentine Airlines (the "Company"), for injunctive relief restraining the Company from violating its obligation under the Railway Labor Act ("Act" or "RLA"), 45 U.S.C., sections 151 et seq., to bargain in good faith with the representative of its employees.[1] Specifically, TWU objected to the Company's proposal to exclude from contract coverage certain job classifications—sales representatives, secretaries to various managers, and chief agents. The last collective bargaining agreement between the parties expired on August 31, 1978; negotiations failed to produce a new agreement; the mediation services of the National Mediation Board were exhausted;[2] and, following the thirty-day statutory waiting period,[3] TWU initiated a strike on May 11, 1979. Simultaneously with the filing of this action, plaintiff sought a preliminary injunction against the Company. After several days of hearings, the Court with the consent of the parties consolidated the hearing of the application for a preliminary injunction with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

Two central issues emerged: (1) is the Company proposal to exclude specified job classifications from contract coverage a mandatory or non-mandatory subject of bargaining, and (2) if it is a non-mandatory subject, has the Company unlawfully insisted upon the proposal to impasse or made acceptance of the proposal a condition of agreement. Both parties draw an analogy to the distinction between mandatory and non-mandatory subjects of bargaining enunciated by the Supreme Court in *NLRB v. Wooster Div. of Borg-Warner Corp.*,[4] for purposes of the National Labor Relations Act ("NLRA").[5] As the Court there stated, the mandatory duty to bargain encompasses

---

1. The Railway Labor Act is made applicable to air carriers by 45 U.S.C. § 181.

2. *Id.* § 183; *see id.* § 155, First.

3. *Id.* § 155, First.

4. 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

5. 29 U.S.C. § 151 et seq. Courts have in other instances, though mindful of the differences between the two statutes, referred to the body of case law developed under the NLRA for assistance in construing the provisions of the RLA. *Brotherhood of R. R. Trainmen v. Jack-*

"the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment * * *.' The duty is limited to those subjects, and within that area neither party is legally obligated to yield."[6] As to other, non-mandatory, subjects, "each party is free to bargain or not to bargain, and to agree or not to agree. . . . But it does not follow that, because [either party] may propose [non-mandatory subjects], it can lawfully insist upon them as a condition to any agreement."[7] In sum, as to mandatory subjects, both parties must bargain but neither must yield. As to non-mandatory subjects, either party may make a proposal but the "proponent may not insist on its position to the point of impasse or as a condition of reaching an agreement, and the other party may decline to discuss the issue altogether without violating the law."[8]

## I

On February 13, 1958, the National Mediation Board ("Mediation Board") certified TWU as the representative of the Company's employees in three crafts or classes. The one at issue, the class of "Clerical, Office, Stores, Fleet and Passenger service employees," included 24 employees of whom one was a secretary and two were sales representatives. Among the remaining employees eligible to vote, a number bore the titles of "Traffic Agent," "Reservation Agent," and "Cargo Agent."[9] In Article 1(c) of the first collective bargaining agreement between the parties,[10] entered into in June 1958, a number of "managerial" positions were excluded from contract coverage, including the job entitled "Executive Secretary to General Manager." In addition, in Article 1(d), the job classification "Sales Representative" was excluded from the terms of the agreement relating to promotion, assignment and displacement, and overtime. Of the job classifications covered by the agreement, the general categories of "Traffic Agent" and "Cargo Agent" were broken out into "Chief Agent," "Lead Agent" and "Agent" positions. Similarly, there were three titles for "Accountant"— Senior Accountant, Accountant and Accounting Clerk.

As the work force expanded and new positions were created, the parties negotiated the inclusion and exclusion of additional classifications. In 1965, the Secretary to the Regional Manager was added to the Article 1(c) excluded positions and the Secretary to the District Sales Manager was partially excluded under Article 1(d).[11] In 1967, the Company recognized TWU as the bargaining agent for an additional craft or class, the Airline Purchasing Commission, which included three positions: Purchasing Commission Chief Agent, Purchasing Commission Accounting Agent, and Purchasing Commission Agent. The Secretary to the District Sales Manager was removed from the partial exclusion of Article 1(d).[12] In 1973, the category of "Reservation Agent," like the categories of Cargo and Traffic Agents before it, was broken out into "Chief," "Lead" and "Agent" positions.[13] In the last contract in 1976, Secretaries to District Sales Managers were again added to the Article 1(d) partial exclusions; the three titles in the Accounting category were changed to "Chief Accounting Agent," "Lead Accounting Agent," and "Accounting Agent"; and the position, "Senior Chief

sonville Terminal Co., 394 U.S. 369, 382–84, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); see Japan Air Lines v. International Ass'n of Machinists, 538 F.2d 46, 51–53 (2d Cir. 1976) (mandatory subjects of bargaining); Gioieni v. Alitalia Airlines, 90 L.R.R.M. 2390, 2392 (S.D.N.Y.1975).

6. 356 U.S. at 349, 78 S.Ct. at 722.

7. Id.

8. R. Gorman, Labor Law 523 (1976).

9. Exhs. A, O.

10. Exh. 4.

11. Exh. P–2.

12. Exh. P–3.

13. Exh. P–5.

Traffic Agent (JFK only)," was added to coverage.[14]

In the agreements from 1965 up to the 1976 contract, the Company reserved the right to create new or additional positions, in addition to those already completely or partially excluded from the contract in Article 1(c) and (d), "but in creating these new or additional positions the proper classifications and rates of pay of such positions shall be established by such agreement with the union, giving due recognition to Article 6C and 6D, and the determinations of the National Mediation Board, regarding 'Official Positions'".[15] Under Article 6C and 6D, which is also included in the 1976 contract, the Company retained the right to introduce new classifications; if the union objected to the classifications or the rates of pay for those classifications, it could process a grievance through the grievance procedures of the contract, including presentation to the System Board of Adjustment.[16] The Company agreed not to discontinue established positions and create new ones under a different title "for the purpose of reducing the rate of pay or evading the application of these articles."[17]

■ Relying on this bargaining history, the Company contends that its proposal to exclude additional job classifications from contract coverage is a mandatory subject of bargaining. This proposal, item 1 of a 14-item list in the Company's section 6 notice of intended changes in the agreement[18] submitted to the TWU on July 28, 1978, provided:

1. Amend Article 1(c) to provide that the agreement shall not cover employees in positions . . . including the following:

(a) Sales Representatives

(b) Secretaries to the District Sales Managers

(c) Secretaries to the Commercial Managers

(d) Secretary to the Personnel Manager

(e) Secretary to the Accounting Manager

(f) Secretaries to the Cargo Managers

(g) Senior Chief Traffic Agent (JFK only)

(h) Chief Traffic Agents

(i) Chief Reservation Agents

(j) Chief Accounting Agents

(k) Chief Cargo Agents

(l) Purchasing Commission Chief Agent

As that proposal is phrased, removing from contract coverage specified job classifications that have historically been included within the craft or class for which TWU is the certified representative and reserving to the Company the unilateral right to determine the rates of pay, hours and working conditions of the affected employees, the subject is clearly non-mandatory. As the Fourth Circuit noted in *Brotherhood of Railway & Steamship Clerks v. Atlantic Coast Line R. Co.*,[19] the Mediation Board has "exclusive jurisdiction . . . over the certification of bargaining agents, the determination of bargaining units and the classification of employees for the purposes of collective bargaining."[20] From this, the Court reasoned that the employer's refusal to bargain with the union with respect to employees within the certified class whom the employer deemed "confidential" was a breach of the employer's obligation under section 2, First of the Act[21] to exert every

---

14. Exh. 5. The Senior Chief Traffic Agent position replaced that of Assistant Manager which was eliminated. *See* Exh. 6 ¶ 17.

15. Article 1(f) in Exhs. P–2 to P–5.

16. Article 6C in Exhs. 5, P–2 to P–5. The provision for a System Board of Adjustment in Article 29 of each of the agreements is in accord with § 204 of the RLA, 45 U.S.C. § 184.

17. Article 6D in Exhs. 5, P–1 to P–5.

18. 45 U.S.C. § 156.

19. 201 F.2d 36 (4th Cir.), *cert. denied,* 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400 (1953).

20. *Id.* at 38.

21. 45 U.S.C. § 152, First.

reasonable effort to make and maintain agreements and the further admonition of section 2, Ninth[22] to "treat with the representative so certified as the representative of the craft or class for the purpose of this chapter." The Court held that the duty to bargain in good faith "is not satisfied when a large group of employees embraced within a bargaining unit is excluded from the benefit of the bargaining process,"[23] or "when all the proper subjects of collective bargaining affecting them are reserved to unilateral action on the part of the employer."[24] Defendant's reliance on the district court decision in *N & W Railway Co. v. Brotherhood of Railway & Steamship Clerks*,[25] for the contrary proposition is misplaced for the Court specifically noted that the "union's proposed changes in the Scope Rules involve work already within the bounds of the craft or class."[26]

■ We agree with the Company that the range of mandatory bargaining subjects under the Act is affected by what is historically bargained about in the industry.[27] The same is true of bargaining under the NLRA,[28] yet a long line of cases have held that the scope of the bargaining unit, whether established by contract or certification, is not a mandatory subject.[29] The

reasoning of these cases, like that of the Fourth Circuit with respect to the RLA, is that the National Labor Relations Board ("NLRB") under section 9(c) of the NLRA[30] is accorded ultimate control of the appropriate bargaining unit and that under section 9(a)[31] the representative selected by the majority of the employees in such unit shall be the exclusive representative of all employees in the unit for the purposes of collective bargaining. The parallels to the RLA are obvious.[32]

■ Finally, the fact that parties have in the past bargained about a non-mandatory subject does not thereafter render the subject mandatory. As our Court of Appeals noted in *NLRB v. Sheet Metal Workers Int'l*: "The importance of preserving parties' freedom to exclude nonmandatory subjects from labor agreements is acknowledged by the rule that '[b]y once bargaining and agreeing on a permissive subject, the parties . . . do not make the subject a mandatory topic of future bargaining.'"[33]

The Company's additional contentions— that by this proposal it meant only that "those classifications which [the Company]

22. *Id.* § 152, Ninth.

23. 201 F.2d at 39.

24. *Id.* at 40.

25. 99 L.R.R.M. 2154 (N.D.Ill.1978).

26. *Id.* at 2156; *cf. Jones v. TWA*, 495 F.2d 790, 797 (2d Cir. 1974).

27. *Order of R.R. Telegraphers v. Chicago & N.W. Ry.*, 362 U.S. 330, 338, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); *Order of R.R. Telegraphers v. REA*, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944).

28. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

29. *National Fresh Fruit & Vegetable Co. v. NLRB*, 565 F.2d 1331 (5th Cir. 1978); *General Drivers & Helpers Union, Local 554 v. Young & Hay Transp. Co.*, 522 F.2d 562, 566 (8th Cir. 1975); *Hess Oil & Chem. Corp. v. NLRB*, 415 F.2d 440 (5th Cir. 1969), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970); *U. S. Pipe & Foundry Co. v. NLRB*, 298 F.2d 873 (5th Cir.), *cert. denied*, 370 U.S. 919, 82 S.Ct. 1557, 8

L.Ed.2d 499 (1962); *International Longshoremen's Ass'n v. NLRB*, 107 U.S.App.D.C. 329, 277 F.2d 681 (1960); *Douds v. International Longshoremen's Ass'n*, 241 F.2d 278 (2d Cir. 1957); *McQuay-Norris Mfg. Co. v. NLRB*, 116 F.2d 748 (7th Cir. 1940), *cert. denied*, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524 (1941); *Newspaper Printing Corp.*, 97 L.R.R.M. 1066, 1068 (1977).

30. 29 U.S.C. § 159(c); *Douds v. International Longshoremen's Ass'n*, 241 F.2d 278, 282 (2d Cir. 1957).

31. 29 U.S.C. § 159(a); *Hess Oil & Chem. Corp. v. NLRB*, 415 F.2d 440, 444 (5th Cir. 1969), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970).

32. *Compare* 29 U.S.C. § 159(a) *and id.* § 159(c) *with* 45 U.S.C. § 152, Ninth.

33. 575 F.2d 394, 399 (2d Cir. 1978) (quoting *Chemical Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 187, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971)).

deems essential to successful management of the Airline should not be subject to the *same terms* of the agreement . . . as apply to the other classifications" [34] or that it intended "to increase the managerial authority of those classifications so that they were truly managerial officials, as defined by the NMB," [35] and thus excluded from the Act's coverage [36]—reflect modifications of its proposal during the bargaining period and are thus relevant to the second issue posed by this litigation, whether the Company impermissibly insisted to impasse on the proposal. But these "interpretations" of the proposal do not comport with its plain terms and therefore do not alter our determination that as originally proposed the subject was non-mandatory. The proposal was to add the listed classifications to Article 1(c) of the agreement which provides for complete exclusion from contract coverage. No testimony was offered at tri-

al that the employees presently in the affected classifications are performing functions other than those historically performed by members of the craft or class.[37] Nor did the proposal as presented to the union indicate intended changes in the job responsibilities of the affected classifications. As a non-mandatory subject of bargaining, the Company was free to propose the changes but not to insist upon them to impasse, the issue to which we now turn.

## II

The bargaining history of the parties detailed earlier indicates that as new job classifications were created and the functions and responsibilities of existing ones altered the parties readily negotiated their inclusion or exclusion. Thus the Company's inclusion of Item 1 in its section 6

---

**34.** Exh. G ¶ 2(a) (emphasis added); *see Brotherhood of Ry. & S. S. Clerks v. Atlantic Coast Line R. Co.,* 201 F.2d 36, 39 (4th Cir.), *cert. denied,* 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400 (1953).

**35.** Defendant's Post-Trial Brief at 47.

**36.** Defendant relies on three decisions by the NLRB which indicate that an employer must bargain with the union concerning proposals to convert bargaining unit jobs into supervisory positions—that is, that such a proposal by the employer is a mandatory subject of bargaining. *Kendall College,* 228 N.L.R.B. 1083, 1087–88 (1977), *enforced,* 570 F.2d 216 (7th Cir. 1978); *Tesoro Petroleum Corp.,* 192 N.L.R.B. 354 (1971); *Cessna Aircraft Co.,* 172 N.L.R.B. 696 (1968). Defendant's attempt to analogize the instant case to these decisions, casting itself in the role of simply complying with its bargaining obligations, is inapt. Unlike *Tesoro Petroleum* and *Cessna Aircraft,* defendant did not propose to discontinue established positions and create new managerial classifications until the final sessions in mid-June 1979. If it took such a step, the union could apply for a representation proceeding under 45 U.S.C. § 152, Ninth in the course of which the Mediation Board would determine whether or not the new positions were truly "managerial." Moreover, under Article 6C and D of all prior contracts, the Company reserved the power to create new classifications subject to the union's right of appeal to the System Board of Adjustment. In the *Kendall College* case, it was not disputed that the proposed additional responsibilities of the divisional chairmen would render them "supervisors" as defined by the NLRA, 29 U.S.C.

§ 152(11), and thus excluded from coverage by the Act, *id.* § 152(3). Here, in contrast, the Company offers no new job description, only the bald statement that it intends to increase the managerial authority of the affected classifications. The RLA, which applies to "employee[s] or subordinate official[s]," 45 U.S.C. § 181, does not exclude all supervisory personnel. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 279, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Lum v. China Airlines Co.,* 413 F.Supp. 613, 616 (D.Hawaii 1976) (employee who performs some supervisory duties but who is himself subject to the supervision of management is covered by the Act); *Northeast Airlines, Inc.,* 3 NMB Determinations 87, 92 (R–3445, 1960) (supervisors in payroll and various accounting departments, while having supervisory duties, also participate in the work carried on by those they supervise, and are therefore members of the craft or class).

**37.** The job descriptions for a number of the challenged classifications in the 1976 agreement comport with those the Mediation Board has held to be within the craft or class of "Clerical, Office, Stores, Fleet and Passenger Service employees" in other cases. For example, *compare* Exh. 5 at 5 (Chief Accounting Agent) *and* 15 (Chief Reservation Agent) *with Northeast Airlines,* 3 NMB Determinations 87, 92 (R–3445, 1960) (Supervisor, Revenue Accounting, IBM Accounting, CAB Accounting) *and id.* at 92–93 (Reservations Manager). *See generally China Airlines, Ltd.,* 6 NMB No. 1031, at 6 (R–4774, 1978) ("supervisors").

notice of intended changes to the agreement[38] was not unusual. TWU responded with a section 6 notice containing 74 proposed changes.[39] The early negotiating sessions between the Company negotiating committee and a union committee consisting of Company employees and local union officials produced no changes in the parties' respective positions. In mid-October 1978, after John Kerrigan, TWU International Staff Representative, joined the negotiations as chief spokesman for the union, the union dropped all but 26 of its original proposals and added two new ones. As to the remainder, the Company accepted some, rejected or modified others. There was a similar give and take as to the Company's list of 14 proposals. The union indicated, however, that four items were unacceptable—those relating to the exclusion of specified job classifications, overtime work, the hiring of part-time employees, and subcontracting. Although the vigor with which the Company pressed these proposals is disputed, the Court finds that the Company, while insisting on "some relief" on the items relating to job classifications, overtime, and part-time employees, did not take an intransigent position on its job classification proposal nor posit it as a condition to agreement.

At the end of October, the Company enlisted the mediation services of the National Mediation Board. At the instigation of the Mediator, the parties met again on January 24, 1979 and the Company submitted a revised proposal[40] covering its own and the union's outstanding demands. The Company had reduced its demands from 14 to 9, eliminated the subcontracting proposal, and modified the items concerning overtime and part-time employees; the proposal with respect to job classifications remained the same. It further agreed to accept certain union demands, suggested changes in others and made a wage offer totaling 10½% over a three-year contract. The union indicated it was not prepared to make any substantial changes in its proposals and continued to refuse to discuss job classifications, overtime and part-time employees. It did, however, delete two proposals and reduce its wage demand from 30% to 24% over a two-year contract.

At the next meeting on February 8, according to Kerrigan, the Company spokesman at that session stated his understanding of the job classification proposal as "merely giv[ing] the company the right to remove people from positions, from one classification to another . . . as an example, he brought up a salesman. He said if they wanted to move him to another job, they could remove him from a salesman but he could exercise his seniority."[41] Although Kerrigan testified that this was solely the spokesman's interpretation of the proposal and not intended as a modification of the job classification item, Kerrigan's notice to TWU's members following the meeting described it as a modification: "The original Company Item # 1 was to remove certain listed positions from the contract. They have modified this to allow the Company to remove individuals from these positions without them having recourse to the grievance procedure. The displaced employee could bump, in the event they have seniority, but the bumped person would go out the door."[42] Peter Tissot, a member of the Company's negotiating committee from the beginning, testified that the original proposal had been modified on February 8, at least with respect to the classification of Sales Representatives; that it was pointed out to the union that these positions were already partially excluded from contract coverage by Article 1(d) of the agreement and that the Company simply sought to exclude them from the grievance procedure for removal as well.

The Mediation Board terminated its mediation efforts in April and the thirty-day waiting period began. As the statutory

---

**38.** Exh. G, attachment B.

**39.** *Id.*, attachment A.

**40.** *Id.*, attachment C.

**41.** T.R. at 316.

**42.** Exh. G, attachment D.

period drew to a close, the Board suggested that informal mediation meetings be held on May 9 and 10. The testimony is in sharp conflict as to what occurred at these meetings. Mel Brackett, newly-elected President of the TWU Local, appeared as chief union negotiator for the first time. He testified that the union indicated its view that the proposal with respect to job classifications was an illegal demand and could not be negotiated, but that all other items were negotiable; that other than making a new wage offer as part of its "final" proposal on May 10, the Company made no meaningful movement and continued to insist on the job classification item in its original form. However, he was without personal knowledge of previous events. He did not know what the Company's wage position had been prior to the meetings, nor was he aware that the job classification item had been modified on February 8. He did not recall that on May 10 the Company escalated its wage offer from 7% per year over a three-year contract to 10% per year over the same period. And he conceded that the union made no counteroffers on any of the Company's proposals.

Peter Tissot, in contrast, testified for the Company that the union took the position from the opening session on May 9 that the Company had to withdraw *all* its proposals before negotiations could get underway. In response to the union's reinstating its original list of 74 demands, the Company reinstated its own original proposal of 14 items, but during the May 9 session it withdrew several demands. Further, on May 10 it opened the session with a 7% wage offer and in the afternoon presented its final offer including a 10% wage increase and five demands, one of which, Item 3, was the job classification proposal in its original form.[43] He explained that the term "final offer" was used because the Company during the two days of meetings had been in the position of making concessions and offers without any response from the union,

other than the demand that all Company proposals be withdrawn. According to Tissot, each of the five demands on the "final proposal" were negotiable. On the basis of Tissot's demeanor as a witness, and the consistency of his testimony with that of other witnesses both union and Company as to certain details of the two final days of meetings, the Court accepts his version of the events of those days. Brackett's assertion that all items were negotiable and that the impasse was created solely by the job classification item is undercut by his concession that the union made no counteroffers, verbal or written, to any Company proposal, and by the fact that in a flyer distributed to employees after the meetings ended in failure, the union listed mandatory overtime and part-time employees, as well as job classifications, as the stumbling blocks to agreement.[44]

After the strike was underway, a meeting was arranged in Argentina through the efforts of the State Department and the International Transport Federation between Ernest Mitchell, International Vice-President of TWU, and three officials of the Company who had not previously taken part in the negotiations. Although Mitchell repeatedly stressed in his testimony that, at the insistence of the Company, the meetings that ensued were completely "informal" and "off the record" and that the "Memorandum of Understanding"[45] and "Company Proposal of 6/25/79"[46] produced thereby were a format for resuming negotiations and not a new proposal, it is nonetheless clear that the Company indicated its willingness to make significant changes in its earlier position. We attribute little weight to the fact that, when the union membership failed to ratify the "Company Proposal of 6/25/79" and resume negotiations, the May 10 list of demands was reinstated as the Company's formal proposal. That both parties returned to their original positions after negotiations proved futile does not indicate that any single item was non-nego-

43. *Id.,* attachment E.

44. *Id.,* attachment F.

45. Exh. 8.

46. Exh. C.

tiable. The record establishes that the Company's attitude was far from intransigent; on the contrary, it appears that in seeking an accommodation with the union the Company yielded on a number of its original demands, including the job classification proposal.

On June 15, the second of two days of meetings in Argentina, the Company presented Mitchell with a written statement of its proposal for settlement.[47] Among other matters, the Company sought clarification of its right to request employees to work overtime, "resign[ed] its right to hire partimers[sic]," increased its wage proposal to 12% annually, "resign[ed] its claim of having Secretaries not covered by the Agreement, with the sole exception of the Secretary to the Personnel Manager," "resign[ed] its claim of having Sales Representatives not covered by the Agreement," "require[d] to include as managerial positions (out of the Agreement) supervisory positions who on the Attached List have become trustworthy personnel." This document, which reflected a substantial withdrawal of the claim upon which plaintiff instituted this action, became the basis for subsequent memoranda of understanding[48] prepared as meetings continued in New York and for the document entitled "Company Proposal of 6/25/79" submitted to the union membership.

The latter document reflected a modified overtime provision, the withdrawal of the proposal with respect to part-time employees, and the increased wage offer. The proposal with respect to subcontracting originally contained in the Company's section 6 notice also appeared but in modified form—rather than allowing the Company to "contract out any work at any time,"[49] it provided only for subcontracting of cargo and operations work with affected employees to be relocated and no lay-offs to occur. The Company also agreed to review a number of union proposals with respect to economic benefits that had not previously been discussed.

Item 10 of the document, entitled "Reorganization," contained two parts. The first part, phrased in the terms of Article 1(c) of prior agreements, listed a number of positions considered managerial employees not covered by the agreement. The majority of the positions so listed had already been excluded from coverage under Article 1(c) of the expired agreement; a number of new classifications, not mentioned in prior agreements either as union positions or as managerial employees, were added to the Article 1(c) exclusions. The only classification previously discussed in the months of negotiations that was added to the list of excluded positions was "Secretary to the Personnel Manager." Sales Representatives were not mentioned.

The second part of Item 10 proposed the complete elimination or discontinuance of specified positions, including all the Chief Agent positions previously listed in the Company's proposal of May 10 and in its original section 6 notice. In addition, the abolition of a number of senior agent positions not previously discussed was proposed. The Item continued: "By eliminating the positions of Chief and Senior Agents, such employees will exercise seniority in order to occupy another position. Rates of pay will be amended accordingly. It is understood that no lay-offs will occur as a result of the above."[50] Mitchell testified that he understood the distinction between the two parts of Item 10—that is between exclusion of classifications from contract coverage and elimination of positions.

The above discussion of the course of bargaining between the parties clearly establishes that the Company at no time assumed an intransigent, "take it or leave it," attitude with respect to the job classification proposal. The proposal was modified once during formal negotiations and substantially altered during the informal sessions in June. During the same period, the

---

**47.** Exh. F.

**48.** Exhs. 7, 8.

**49.** Exh. G, attachment B.

**50.** Exh. C.

Company modified or eliminated certain of its demands that were mandatory subjects of bargaining and responded favorably to a number of union demands, significantly increasing, for example, its wage offer to 12% annually. While the Company presented, repeatedly, its proposal on the non-mandatory subject of job classifications, it never posited this demand as an inflexible condition to agreement. The cases following the Supreme Court's decision in *Borg-Warner* under the NLRA do not forbid "what we have here, packages and proposals which economically augment the mandatory proposals in an effort to secure acceptance of nonmandatory ones." [51] To enjoin a bargaining demand, which has not been insisted upon to impasse, as a violation of the Company's duty to bargain in good faith, would constitute an unwarranted interference with legitimate bargaining techniques.[52]

### Conclusion

In sum, the Company's proposal with respect to job classifications as formulated in Item 1 of its section 6 notice of July 28, 1978 and Item 3 of its May 10 proposal is a non-mandatory subject of bargaining. The Company did not, however, insist upon this proposal to impasse or make it a condition of agreement. Therefore, plaintiff's request for injunctive relief is denied.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment may be entered accordingly.

**51.** *Oil Chemical & Atomic Workers Int'l Union, Local 3–89 v. NLRB*, 132 U.S.App.D.C. 43, 49, 405 F.2d 1111, 1117 (1968).

**52.** *Id.* 132 U.S.App.D.C. at 49–50, 405 F.2d at 1117–18; *see National Fresh Fruit & Vegetable Co. v. NLRB*, 565 F.2d 1331, 1336 (5th Cir. 1978); *Indiana Metal Prods. v. NLRB*, 442 F.2d 46, 53 (7th Cir. 1971); *Philip Carey Mfg. Co. v. NLRB*, 331 F.2d 720, 726–28 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964); *International Longshoremen's Ass'n v. NLRB*, 107 U.S.App.D.C. 329, 331, 277 F.2d 681, 683 (1960).